

Opinions of the United
States Court of Appeals
for the Third Circuit

1-13-1997

# ACLU NJ v. Schundler

Precedential or Non-Precedential:

Docket 95-5865,95-5866,96-5023

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation
"ACLU NJ v. Schundler" (1997). *1997 Decisions.* Paper 10.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/10

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 95-5865, 95-5866 and 96-5023
_____


AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY, on behalf
        of its members; ROBERT LANDER; ADAM JACOBS;
        JOEL SOLOW; and ANN SORREL

                vs.

BRET SCHUNDLER, in his official capacity as Mayor of
        the City of Jersey City, New Jersey; THE CITY
        COUNCIL OF JERSEY CITY, NEW JERSEY; CITY OF
        JERSEY CITY, NEW JERSEY

        Bret Schundler, the City Council of
            Jersey City, and the City of Jersey
            City, New Jersey,

                    Appellants No. 95-5865 and
                         No. 95-5866.

_____


AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY, on behalf
        of its members; ROBERT LANDER; ADAM JACOBS;
        JOEL SOLOW; and ANN SORREL

                        Appellants No. 96-5023

                vs.

BRET SCHUNDLER, in his official capacity as Mayor of
        the City of Jersey City, New Jersey; THE CITY
        COUNCIL OF JERSEY CITY, NEW JERSEY; CITY OF
        JERSEY CITY, NEW JERSEY

_____



APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. No. 95-cv-00206)

_____


1

ARGUED AUGUST 7, 1996

BEFORE:  NYGAARD, LEWIS and McKEE, Circuit Judges.

(Filed January 13, 1997)

_____

Kevin J. Hasson (ARGUED)
The Becket Fund for Religious Liberty
2000 Pennsylvania Avenue, N.W.
Suite 3200
Washington, DC  20006

Attorney for Bret Schundler, the City Council of Jersey
        City, New Jersey, and the City of Jersey
        City, New Jersey


Ronald K. Chen
Rutgers Constitutional Litigation Clinic
Rutgers University School of Law
15 Washington Street
Newark, NJ  07102

David R. Rocah (ARGUED)
American Civil Liberties Union
2 Washington Place
Newark, NJ  07102

Attorneys for American Civil Liberties Union of New
        Jersey, Robert Lander, Adam Jacobs, Joel
        Solow and Ann Sorrel

_____

OPINION OF THE COURT
_____


LEWIS, Circuit Judge.

        Toward the end of each calendar year, people around the
world celebrate what has come to be known as "the holiday
season."  Some do so by adorning their lawns with various
religious or secular ornaments, which are usually intended to

2

convey an individual's interpretation of the holiday season. Thus, while some may subtly express an acknowledgement of the season through a lighted tree or a candle in a window, others may prefer a dazzling array of lights, ornaments, and a cast of religious and secular characters.

Although the Constitution provides no guidance on matters of taste or aesthetics, it does provide protection for citizens to erect even the most energy-consuming, taste-challenged holiday display. In particular, the Free Exercise Clause guarantees the citizen's right to celebrate the season's religious origins. This right is reinforced by the Establishment Clause, which prevents the government from imposing its religious will upon its citizens. Thus, while the individual citizen can express himself or herself freely during the holiday season through the display of religious symbols, the Establishment Clause imposes constraints on the content of government-sponsored holiday displays. By restricting government displays, the Establishment Clause prevents government from sponsoring, celebrating, or endorsing religion.

The uncertain contours of these Establishment Clause restrictions virtually guarantee that on a yearly basis, municipalities, religious groups, and citizens will find themselves embroiled in legal and political disputes over the content of municipal displays. As a result, threats of municipal display lawsuits and restraining orders have become almost as much a part of the holiday season as last-minute shopping sprees.

In this case, we must determine whether the City of Jersey City, New Jersey, should be permitted to erect a display containing a crèche and a menorah on the lawn in front of its City Hall. We will affirm the district court's holding that the City's original display of the crèche and the menorah violated the Establishment Clause. In addition, we will hold that the district court applied the wrong standard to determine that the City's second display, which added Santa Claus, Frosty the Snowman, and a red sled to the crèche and menorah, did not violate the Establishment Clause.

I.

Facts and Procedural History

Appellees and Cross-Appellants, the American Civil Liberties Union of New Jersey ("ACLU") and four residents of Jersey City brought this action against Appellants and Cross-Appellees, the City of Jersey City (the "City"), its mayor and its city council. The ACLU sought to preliminarily and permanently enjoin the City from erecting and maintaining a holiday display containing a crèche and a menorah on the lawn (also known as "City Hall Plaza") in front of its City Hall. The City has displayed the crèche and menorah in City Hall Plaza for at least the past thirty years. Both the crèche and menorah, as well as the property on which the displays are located, are owned by the City.

Jersey City displays its crèche, a representation of the Christian nativity scene, on the days immediately preceding and following Christmas. The crèche is a depiction of the day

4

Jesus was born in a manger in Bethlehem.  The City's display is approximately twelve feet long by eight feet wide and includes replicas of Joseph, Mary, Jesus, and the Three Wisemen, as well as traditional manger imagery such as farm animals and hay.  The event depicted by the crèche has particular significance to the Christian religion, which worships Jesus as the Son of God and the Messiah.

Jersey City displays its menorah, a nine-branched candelabrum, during the Jewish holiday of Hanukkah.  A menorah is used by Jews to commemorate the Miracle of the Oils, a seminal event in Jewish history that took place during the rededication of the Temple of Jerusalem.  The lighting of the menorah is the central ritual of Hanukkah.  As the Supreme Court recognized in Allegheny County v. ACLU, 492 U.S. 573, 587 & n.33 (1989), in contrast to the Christian celebration of Christmas, Hanukkah is not one of the central religious holidays of Judaism.

Jersey City customarily displays the menorah on the Plaza lawn to the left of the main entrance to City Hall and the crèche on the lawn to the right.  Because the Hanukkah festival normally overlaps with the Christmas season, the menorah and crèche are usually displayed at the same time.  In 1994, however, when the present action was initiated, Hanukkah fell unusually early on the calendar (November 28 to December 5).  Consequently, the City took down the menorah display the day before it erected the crèche.  The City also decorated an evergreen tree with Christmas ornaments on the Plaza lawn on December 14.  Other than

5

this tree, the crèche and menorah displays were unaccompanied by any other traditional secular symbols of the holiday season.[1]

The ACLU sent a letter to Jersey City Mayor Bret Schundler asking the City to reevaluate its practice of displaying religious symbols on public property.  In response, the City erected a sign adjacent to its display in front of City Hall on December 16, 1994, which read:  "Through this display and others throughout the year, the City of Jersey City is pleased to celebrate the diverse cultural and ethnic heritages of its peoples."  Thus, when the ACLU initiated this lawsuit, the Jersey City holiday display was comprised of a crèche, a Christmas tree, and the sign.

On December 21, 1994, the ACLU filed a complaint in the Superior Court of New Jersey seeking a declaratory judgment and a permanent injunction to prevent the City from displaying a menorah and a crèche on the Plaza in front of Jersey City City Hall during the winter holiday season.  In their five-count complaint, the ACLU alleged violations of the First and Fourteenth Amendments of the United States Constitution, as well

---

1.    It is unclear whether the district court was aware that the 1994 display contained the Christmas tree or whether it concluded that the tree was too far removed from the crèche and the menorah to be considered part of an integrated holiday display.  See Dist. Ct. Op. at 11-12.  The Christmas tree is an evergreen tree that stands on the City lawn.  During the holiday season, the City typically transforms the evergreen into a Christmas tree by decorating it with lights and other ornaments.  The district court's possible confusion regarding the tree may have been caused by the fact that the tree was not visible in the photographs of the display that were entered into the record. For whatever reason, the district court did not consider the tree to be a component of the 1994 display.

as three provisions of the New Jersey Constitution.[2]  The City removed the action to federal district court.  On September 19, 1995, both parties moved for summary judgment.

On November 28, 1995, the United States District Court for the District of New Jersey issued an order granting the ACLU's motion for summary judgment on counts one and three, sustaining their claims based upon the Establishment Clause of the First Amendment of the United States Constitution and the Religious Preference Clause of the New Jersey Constitution.  ACLU of N.J. v. Schundler, No. 95-206, 1995 WL 869972, at *8 (D.N.J. Nov. 28, 1995).  The district court entered a permanent injunction prohibiting the City from "erecting the crèche and menorah display described in the complaint in this action, or any substantially similar scene or display at the front entrance of the City of Jersey City City Hall or on other property owned, maintained, or controlled by the defendants in their official capacities."  ACLU of N.J. v. Schundler, No. 95-206 (D.N.J. Nov. 28, 1995) (order granting injunction).

On December 13, 1995, despite the district court's injunction, Jersey City erected its annual holiday display in front of City Hall.  The 1995 display consisted of the traditional crèche and menorah but also included a four-foot tall

---

2.    The five counts are based on alleged violations of the following:  (1) the Establishment Clause of the First Amendment of the United States Constitution; (2) the Equal Protection Clause of the Fourteenth Amendment; (3) the Religious Preference Clause of Article I, Paragraph 4 of the New Jersey Constitution; (4) Article I, Paragraph 3 of the New Jersey Constitution; and (5) Article I, Paragraph 5 of the New Jersey Constitution, the state equivalent of the Federal Equal Protection Clause.

7

plastic figure of Santa Claus, a four-foot tall plastic figure of Frosty the Snowman, and a red wooden sled. Frosty and the sled were placed on the same side of the Plaza as the crèche, and Santa was placed near the menorah and the Christmas tree. The 1995 version of the crèche was slightly different from the 1994 version. The figures in the crèche were taken out of the manger and placed in a circle to one side of the empty manager. The City Hall Plaza Christmas tree was also slightly different, as it was decorated with Kwanzaa symbols in addition to the usual lights and holiday ribbons. This modified 1995 display was also accompanied by two 20" x 30" signs bearing the City seal and the statement: "Through this display and others throughout the year, the City of Jersey City is pleased to celebrate the diverse cultural and ethnic heritage of its people."

In response to the City's 1995 display, the ACLU submitted applications to the district court for both a preliminary injunction against further display of the menorah and crèche and a judgment that the City was in civil contempt of the injunction issued November 28, 1995. On December 18, 1995, the district court issued an order denying the ACLU's request for a preliminary injunction and its petition for contempt. The court concluded that the addition of Santa and Frosty, as well as the sled and the Kwanzaa symbols, brought the City's display into compliance with the Establishment Clause. The district court thus modified its order of November 28, 1995, to require the City to maintain the additional secular holiday exhibits (i.e., Frosty, Santa, and the sled) in order to remain in compliance

8

with the Establishment Clause.  ACLU of N.J. v. Schundler, No. 95-206 (D.N.J. Dec. 21, 1995) (order denying preliminary injunction).  The district court, in entering the order, stated:

> I conclude that by making these additions defendants have sufficiently demystified the [holy], they have sufficiently desanctified sacred symbols, and they have sufficiently deconsecrated the sacred to escape the confines of the injunctive order in this case.

Tr. at 12.

The City timely filed notices of appeal on December 20, 1995, from both the November 28 order and injunction, as well as the December 18 order modifying that injunction.  The City asserts that the district court erred by concluding both that its 1994 holiday display of a crèche and a menorah was unconstitutional and that its 1995 holiday display was constitutional as modified.  In other words, the City asserts that both its unmodified 1994 display and its modified 1995 display were in compliance with the Establishment Clause.  On January 4, 1996, the ACLU cross-appealed from the December 18, 1995 order denying their second application for injunctive relief.  The ACLU maintains that both displays violate the Establishment Clause of the First Amendment.

## II.

### The Supreme Court's Display Cases

The Establishment Clause of the First Amendment declares that "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  In the Supreme Court's seminal modern Establishment Clause case, Everson

9

v. Board of Education, 330 U.S. 1, 15 (1947), the Court recognized that "[n]either a state nor the Federal Government can set up a church.  Neither can pass laws which aid all religions, or prefer one religion over another."  The Court, paraphrasing Thomas Jefferson, stated that the First Amendment "has erected a wall between church and state."  Id.

The wall-of-separation metaphor, however, overstates the actual level of separation of church and state the Court has required in its Establishment Clause jurisprudence.  The Court has determined that government may acknowledge the nation's religious heritage and that not every law or practice that confers a benefit upon religious institutions is unconstitutional.  See Committee for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 760 (1973).[3]

We have recognized that the much-maligned test arising out of Lemon v. Kurtzman, 403 U.S. 602 (1971) (the "Lemon test"), continues to provide the analytical framework courts must use to determine whether a particular practice violates the Establishment Clause.  ACLU of N.J. v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471 (3d Cir. 1996) (in banc).  In Black Horse Pike, we stated:

> The Lemon test has been the subject of critical debate
> in recent years, and its continuing vitality
> has been called into question by members of
> the Supreme Court and by its noticeable
> absence from the analysis in some of the

3.    One commentator has noted that the Supreme Court's Establishment Clause jurisprudence suggests that "the wall of separation is about to resemble the one that divided Berlin -- demolished, yet ghostly and evocative."  Ira C. Lupu, *The Trouble With Accommodation*, 60 Geo. Wash. L. Rev. 743, 768 (1992).

Court's recent decisions (including <u>Lee</u>).
Nevertheless, <u>Lemon</u> remains the law of the
land, and we are obligated to consider it
until instructed otherwise by a majority of
the Supreme Court.

<u>Id</u>. at 1484.  The <u>Lemon</u> test is a three-pronged test requiring
the following:  (1) the statute or government practice must have
a secular purpose; (2) its practical effect must be one that
neither advances nor inhibits religion; and (3) the statute or
government practice must not foster "an excessive government
entanglement with religion."  <u>Lemon</u>, 403 U.S. at 612-13.

The Supreme Court first applied the <u>Lemon</u> test to a
government-sponsored holiday religious display in <u>Lynch v.
Donnelly</u>, 465 U.S. 668 (1984).  In <u>Lynch</u>, a 5-4 decision, the
Court upheld the constitutional validity of a winter holiday
display maintained by the city of Pawtucket, Rhode Island.  The
display was situated in a private park.  The display itself was
owned by the city and included a crèche, a wishing well, a Santa
Claus house (with a live Santa), a Christmas tree, reindeer
pulling Santa's sleigh, candy-striped poles, a "Seasons
Greetings" banner, hundreds of colored lights, live carolers, and
cutout figures of a clown, an elephant, and a teddy bear.  <u>Id</u>. at
671.  The Court, applying the <u>Lemon</u> test, found that:  (1) the
display, because it contained secular as well as religious
symbols, had the legitimate secular purpose of recognizing and
celebrating a national holiday; (2) the crèche did no more to
advance or inhibit religion than the myriad government benefits
and endorsements previously held constitutionally permissible;

11

and (3) there was no evidence of administrative entanglement of religion.  Id. at 680-85.

Justice O'Connor's concurrence in Lynch focused primarily on the second prong of the Lemon test.  She styled her approach as an "endorsement test," which stated that "[e]ndorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."  Id. at 688 (O'Connor, J., concurring).  The context of the particular government practice was at the core of Justice O'Connor's endorsement test.  She stated:

Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion.  In making that determination, courts must keep in mind both the fundamental place held by the Establishment Clause in our constitutional scheme and the myriad, subtle ways in which Establishment Clause values can be eroded.  Government practices that purport to celebrate or acknowledge events with religious significance must be subjected to careful judicial scrutiny.

Id. at 694 (emphasis added).

In Allegheny County v. ACLU, 492 U.S. 573 (1989), the Supreme Court again considered the constitutionality of a holiday display.  Allegheny County involved two different displays.  The first display was a crèche located on the Grand Staircase of the Allegheny County, Pennsylvania Courthouse.  Id. at 580.  The second display was a menorah placed next to a Christmas tree and a sign saluting liberty, all of which were

12

located just outside the Pittsburgh City-County Building.  Id. at 582.  The crèche display was surrounded by a fence and a poinsettia floral frame and included small evergreen trees but did not include traditional secular holiday figures.  The crèche had at its crest an angel bearing a banner that proclaimed "Gloria in Excelsis Deo," which translates to "Glory to God in the highest."  Id. at 580 & n.5.  The menorah, on the other hand, was placed next to a Christmas tree and a sign saluting liberty.

The Court's decision in Allegheny County spawned several opinions and two different holdings.  A 5-4 majority held that the display of the crèche in the county courthouse violated the Establishment Clause.  A 6-3 majority upheld the constitutional validity of the display of a menorah next to a Christmas tree outside the City-County Building.[4]

Writing for the 5-4 majority, Justice Blackmun discussed the Court's move away from Lemon toward a "refined . . . definition of governmental action that unconstitutionally advances religion."  Id. at 592.  Focusing on the word "endorsement" put forth by Justice O'Connor's concurrence in Lynch, Justice Blackmun concluded that:

> The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from "making adherence to a religion relevant in any way to a person's standing in the political community."

---

4.    In Allegheny County, the ACLU specifically challenged the display of the menorah, not the Christmas tree.

13

<u>Id.</u> at 594 (citing <u>Lynch</u>, 465 U.S. at 687 (O'Connor, J., concurring)).

Justices Blackmun and O'Connor represented the swing votes. Both Justices voted to allow the menorah and the Christmas tree display and to disallow the crèche display. To pinpoint the Court's reasoning in permitting the menorah and Christmas tree display while condemning the crèche display, we must analyze the rationale of the swing votes.

Justice Blackmun began his opinion (writing for the majority) by recognizing that the crèche display at issue in the case conveyed "praise to God in Christian terms [which] is indisputably religious -- indeed sectarian -- just as it is when said in the Gospel or in a church service." <u>Id.</u> at 598. Justice Blackmun then distinguished <u>Lynch</u>, flatly rejecting the notion that <u>Lynch</u> rendered crèche displays per se constitutionally permissible. On the contrary, Justice Blackmun emphasized that nothing in the context of the display at issue detracted from the crèche's religious message. In addition, Justice Blackmun recognized that the crèche sat on the Grand Staircase in the courthouse, which was "the main and most beautiful part of the building that is the seat of county government." <u>Id.</u> at 599. As such,

> [n]o viewer could reasonably think that it occupies this location without the support and approval of the government. Thus, by permitting the "display of the crèche in this particular physical setting," <u>Lynch</u>, 465 U.S. at 692 (O'Connor, J., concurring), the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the crèche's religious message.

14

Id. at 601.  Thus, given the content and context of the crèche

display, Justice Blackmun, writing for the majority of the Court,

concluded that:

Lynch teaches that government may celebrate Christmas
in some manner and form, but not in a way
that endorses Christian doctrine.  Here,
Allegheny County has transgressed this line.
 It has chosen to celebrate Christmas in a
way that has the effect of endorsing a
patently Christian message:  Glory to God for
the birth of Jesus Christ.  Under Lynch, and
the rest of our cases, nothing more is
required to demonstrate a violation of the
Establishment Clause.

Id. at 602.

Later in his opinion Justice Blackmun, no longer

writing for a majority of the Court, presented the reasons why he

voted to allow the menorah and Christmas tree display.  Justice

Blackmun recognized that government celebration of Christmas and

Hanukkah as religious holidays would violate the Establishment

Clause,[5] but concluded that Allegheny County's display of a

Christmas tree and a menorah "recognizes that both Christmas and

Chanukah are part of the same winter-holiday season, which has

attained a secular status in our society."  Id. at 616.  His

conclusion was based largely on the fact that he considered the

Christmas tree to be a secular symbol due to the fact that "many

Americans place Christmas trees in their homes without

subscribing to Christian religious beliefs."  Id. at 616-17.

Justice Blackmun also relied heavily on the spatial context of

the display, commenting that:

5.    In this discussion, Justice Blackmun stated that "[t]he
display of a menorah next to a crèche on government property
might prove to be invalid."  492 U.S. at 615 n.61.

15

The tree, moreover, is clearly the predominant element in the city's display. The 45-foot tree occupies the central position beneath the middle archway in front of the Grant Street entrance to the City-County Building; the 18-foot menorah is positioned to one side. Given this configuration, it is much more sensible to interpret the meaning of the menorah in light of the tree, rather than vice versa. In the shadow of the tree, the menorah is readily understood as simply a recognition that Christmas is not the only traditional way of observing the winter-holiday season.

Id. at 617.

In her concurrence, Justice O'Connor also focused on the question of endorsement. Reviving the endorsement test she formulated in her concurrence in Lynch, Justice O'Connor presented the reasons for treating the crèche in Lynch differently from the crèche in Allegheny County:

In Lynch, I concluded that the city's display of a crèche in its larger holiday exhibit in a private park in the commercial district had neither the purpose nor the effect of conveying a message of government endorsement of Christianity or disapproval of other religions. The purpose of including the crèche in the larger display was to celebrate the public holiday through its traditional symbols, not to promote the religious content of the crèche. Nor, in my view, did Pawtucket's display of the crèche along with secular symbols of the Christmas holiday objectively convey a message of endorsement of Christianity.

. . . I agree that the crèche displayed on the Grand Staircase of the Allegheny County Courthouse, the seat of county government, conveys a message to nonadherents of Christianity that they are not full members of the political community, and a corresponding message to Christians that they are favored members of the political community. In contrast to the crèche in Lynch, which was displayed in a private park in the city's commercial district as part of a broader display of

16

> traditional secular symbols of the holiday season, this crèche stands alone in the county courthouse.  The display of religious symbols in public areas of core government buildings runs a special risk of making religion relevant, in reality or public perception, to status in the political community.

Id. at 626 (O'Connor, J., concurring) (citations omitted) (emphasis added).

Justice O'Connor agreed with Justice Blackmun that the menorah and Christmas tree display was constitutionally permissible for "reasons which differ somewhat."  Id. at 632.  Justice O'Connor, like Justice Blackmun, concluded that a Christmas tree was a secular object but disagreed that the menorah was largely secular in the context of the display.  She viewed the menorah as "the central religious symbol and religious object" of Hanukkah.  Id. at 633.  The question for her, therefore, was whether "the Christmas tree is a predominantly secular symbol and, more significantly, [whether it] obscures the religious nature of the menorah and the holiday of Hanukkah."

Id.  In answering this question, Justice O'Connor concluded:

> By accompanying its display of a Christmas tree -- a secular symbol of the Christmas holiday season -- with a salute to liberty, and by adding a religious symbol from a Jewish holiday also celebrated at roughly the same time of the year, I conclude that the city did not endorse Judaism or religion in general, but rather conveyed a message of pluralism and freedom of belief during the holiday season.  Although the religious and indeed sectarian significance of the menorah is not neutralized by the setting, this particular physical setting changes what viewers may fairly understand to be the purpose of the display -- as a typical museum setting, though not neutralizing the religious content of a religious painting,

17

> negates any message of endorsement of that
> content.

Id. at 635 (citations omitted).

The Supreme Court revisited the Establishment Clause recently in Capitol Square Review & Advisory Board v. Pinette, ___ U.S. ___, 115 S. Ct. 2440, 132 L.Ed.2d 650 (1995). Again, the Court produced several opinions purporting to present the "correct" Establishment Clause analysis. Capitol Square is instructive to our analysis because, although it involves private religious expression in a traditional open forum, the Court indicated that it will likely apply an endorsement-test approach to determine the constitutionality of a public religious display.

In Capitol Square, the Court held that Ohio's denial of the Ku Klux Klan's application to display an unattended cross on the statehouse square could not be justified on the ground that granting a permit would have violated the Establishment Clause. Justice Scalia wrote for a 7-2 majority of the Court. Id. at 2447. A second portion of Justice Scalia's opinion, in which he rejected the application of Justice O'Connor's endorsement test to the privately-sponsored cross display, was a plurality opinion joined by Chief Justice Rehnquist and Justices Kennedy and Thomas. Id. at 2447-48. Justice O'Connor, joined by Justices Souter and Brennan, wrote separately to apply the endorsement test but concluded that a reasonable observer would not attribute the religious message conveyed by the cross to the State. Id. at 2451. Justice Stevens dissented, concluding that a reasonable observer would normally assume that the placement of a symbol of

18

religious character before a seat of government would convey a message of state sponsorship.  Id. at 2464.  Justice Ginsburg also dissented, determining that the display of the cross would have carried a message of endorsement by the State.  Id. at 2474.

Justice Scalia, writing for the plurality, distinguished Allegheny County and Lynch by stating:

> In Allegheny County we held that the display of a privately-sponsored crèche on the "Grand Staircase" of the Allegheny County Courthouse violated the Establishment Clause.  That staircase was not, however, open to all on an equal basis, so the County was favoring sectarian religious expression.  We expressly distinguished that site from the kind of public forum at issue here, and made clear that if the staircase were available to all on the same terms, "the presence of the crèche in that location for over six weeks would then not serve to associate the government with the crèche."  In Lynch we held that a city's display of a crèche did not violate the Establishment Clause because, in context, the display did not endorse religion.  The opinion does assume . . . that the government's use of religious symbols is unconstitutional if it effectively endorses sectarian religious belief.  But the case neither holds nor even remotely assumes that the government's neutral treatment of private religious expression can be unconstitutional.

Id. at 2448 (citations omitted).

Although the plurality refused to apply the endorsement test to the privately-sponsored cross display in Capitol Square, it acknowledged that the endorsement test would be properly employed to test the constitutionality of government speech.  Id. at 2448-49.  Writing for the plurality, Justice Scalia noted, "[w]here we have tested for endorsement of religion, the subject of the test was . . . expression by the government itself

19

. . . ." Id. at 2447 (citation omitted). Thus, Capitol Square indicates that at least a majority of the Court would apply an endorsement test to determine the constitutionality of a government-sponsored religious display on government property.

In light of the Supreme Court's decisions in Allegheny County and Capitol Square, we conclude that the endorsement test is the proper analysis to apply to Jersey City's display of religious symbols on city property.[6] Under the facts of this case, we need not reach the question debated by the members of the Court in Capitol Square of whether the endorsement test should be limited in application to government speech, because the religious symbols at issue here are owned and displayed by the city government on city government property.[7]

---

6. Again, it is not our intention to depart from this Court's recent pronouncement in ACLU of New Jersey v. Black Horse Pike Regional Board of Education, 84 F.3d 1471, 1484 (3d Cir. 1996) (in banc), that "Lemon remains the law of the land" as the governing test for Establishment Clause cases. Rather, we merely reiterate that in Establishment Clause challenges to religious displays, the Supreme Court has emphasized that the endorsement test -- a refinement of the "effects" prong of Lemon -- should be the focus of our analysis.

7. We do not mean to imply, however, that a display identical to the one presented by Jersey City (if privately sponsored) would necessarily withstand constitutional scrutiny. Rather, we merely point out that the display at issue here does not fall within the so-called exception to the endorsement test put forth by the plurality in Capitol Square. See Capitol Square, 115 S. Ct. at 2451 (O'Connor, J., concurring).

20

III.

The Original Display

A.    Government Erection of a Crèche

Under the endorsement test, a display violates the Establishment Clause if, in its particular setting, the display is "sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by non-adherents as a disapproval of their individual religious choices." Allegheny County, 492 U.S. at 597.  In applying the endorsement test to Jersey City's display, we must consider the particular effects of its display of a crèche.

One of the principles that emerges from the shifting pluralities of Allegheny County is that government erection of a crèche creates an inherent risk of perceived endorsement.  The crèche, which depicts the event that lies at the very core of Christianity, is an unambiguous religious symbol.[8]  Indeed, Justice O'Connor in Allegheny County recognized that a crèche is "the central religious symbol of the Christmas holiday."  Id. at 627.

A crèche represents the Christian belief that Jesus was born to the Virgin Mary to lead humankind on a path toward salvation and redemption. Yet Jersey City would have us believe that the symbol of the crèche has achieved such a level of

_____

8.    One commentator suggests that the Supreme Court's decisions in the display cases are guided by their view of the messages conveyed by particular religious symbols and whether these symbols are "pure" or "ambiguous."  Calvin R. Massey, *Pure Symbols and the First Amendment*, 17 Hastings Const. L.Q. 369, 379-82 (1990).

21

secular status that it is religiously benign.  We are not so persuaded.  The mere fact that a religious symbol is pervasively displayed during the holiday season does not diminish its religious significance.  A crèche unambiguously represents a belief that is not universally shared by the citizens of this country.  In fact, many citizens believe that Jesus may only be understood as a Hebrew prophet.  For some devout observers of their respective faiths, it is heresy to ascribe a divine character or purpose to Jesus' life or death.  Indeed, as Justice Brennan recognized in his dissent in Lynch, "[F]or Christians, that path [toward salvation and redemption] is exclusive, precious, and holy.  But for those who do not share these beliefs, the symbolic reenactment of the birth of a divine being who has been miraculously incarnated as a man stands as a dramatic reminder of their differences with Christian faith."  Lynch, 465 U.S. at 708 (Brennan, J., dissenting).

When government chooses to speak by erecting a crèche on government property, the principles at the core of the Establishment Clause are clearly implicated.  See Capitol Square, 115 S. Ct. at 2448 ("In Allegheny County, we held that the display of a privately-sponsored crèche on the `Grand Staircase' of the Allegheny County Courthouse violated the Establishment Clause.  That staircase was not, however, open to all on an equal basis, so the County was favoring sectarian religious expression.").  By erecting a crèche itself, on city property, a city sends a stronger message of endorsement of religion than when it merely provides a forum for private religious speech.  In

22

the former context, the government is effectively conveying the message that "we celebrate the holiday season by recognizing the birth of Christ."  As Justice O'Connor noted in Allegheny County, "[T]he display of religious symbols in public areas of core government buildings runs a special risk of making religion relevant, in reality or in public perception, to status in the political community."  Allegheny County, 492 U.S. at 626 (O'Connor, J., concurring).  Accordingly, we conclude that Jersey City's display of a crèche on City Hall Plaza -- the very seat of Jersey City government -- conveyed a message of religious endorsement.

Further, we note that the expenditure of public funds to erect and maintain a religious display directly implicates the Establishment Clause.  Jersey City's display was erected and maintained with public funds.  If a city taxpayer objected to the religious display, he or she could not have opted out of contribution to the display, even if fundamentally repugnant to his or her own beliefs.  Of course, taxpayers often exercise little control over how the government spends its money on a daily basis, but the Establishment Clause presents unique constraints on the expenditure of public funds for religious purposes.[9]  Most importantly, the Establishment Clause requires the government to remain neutral towards religion in its expenditure of public funds.

9.    In recognition of these constraints, the Supreme Court has acknowledged taxpayer standing in the Establishment Clause context, while rejecting taxpayer standing in others.  See Flast v. Cohen, 392 U.S. 83 (1968).

23

Here, Jersey City expressed a religious preference by erecting a religious display through the expenditure of taxpayer dollars.[10]  Moreover, by using taxpayer dollars to fund a display containing religious symbols, Jersey City has increased the risk that the display's religious message will be attributed to the city and its taxpayers.  In other words, Jersey City's use of public funds to erect and maintain its display increased the "risk of making religion relevant . . . to status in [Jersey City's] political community."  Allegheny County, 492 U.S. at 626 (O'Connor, J., concurring).

Jersey City's display of a crèche was accompanied by a menorah, a sign, and a Christmas Tree.  Jersey City maintains that this context alters the message of endorsement conveyed by the display of the crèche.  We disagree.  The menorah is a religious symbol.  And when displayed with a crèche, the menorah's religious significance is emphasized.  Moreover, the token inclusion of the Christmas tree does little to mitigate the religious message of the crèche and the menorah.  Thus, the display cannot be viewed as anything but a constitutionally impermissible dual endorsement of Christianity and Judaism.

Read together, Lynch, Allegheny County, and Capitol Square emphasize the importance of perceived government endorsement of religion in Establishment Clause analysis.  A

---

10.    For an interesting discussion of the Establishment Clause implications of using taxpayer dollars to fund religious displays, see generally Jesse H. Choper, Securing Religious Liberty:  Principles for Judicial Interpretation of the Religion Clauses (1995).

comparison of Jersey City's display with the displays involved in Allegheny County and Lynch reinforces the conclusion that Jersey City's original display impermissibly endorsed religion.  In Allegheny County, a privately-owned nativity scene was displayed on the main staircase of the county courthouse, bounded by a wooden fence, poinsettias, and a plaque stating "This Display Donated by the Holy Name Society."  Allegheny County, 492 U.S. at 580.  Thus, even with a sign proclaiming private ownership of the display, the Court held that the display, in its context (on the grand staircase of the Allegheny County Courthouse), communicated state endorsement of religion.  In Lynch, the government-owned and maintained crèche was part of a "winter wonderland" display and was situated in a privately-owned park not located near any visible seat of government.  Because there were no external indicia of government sponsorship of the crèche, the risk of perceived endorsement was significantly lessened.  And in Capitol Square, the Court upheld the constitutionality of the display of a privately-sponsored cross in a public square because the government was not "sponsoring" the speech.

In this case,  Jersey City not only owned and maintained the crèche but chose to erect it on City Hall Plaza -- the very seat of Jersey City government.  Moreover, the sign that accompanied the display proudly proclaimed that the display was sponsored by Jersey City.  Like the crèche in Allegheny County, the crèche and the menorah were located prominently at the visible seat of government power.  The City placed the display such that all visitors to City Hall were confronted with

25

prominent religious symbols.  The Establishment Clause prohibits the government, when speaking, from expressing favoritism towards a particular religion.  By using the City Hall Plaza as a forum from which to communicate its endorsement of Christianity and Judaism, Jersey City violated the Establishment Clause.[11]

B.    The City's Diversity/Pluralism Justification

The City maintains that its celebration of many different religions throughout the year should be considered the "context" in which the crèche and the menorah should be viewed, effectively converting its religious displays from "endorsement of religion" into a "celebration of diversity."

There are three reasons why the City's diversity/pluralism justification fails to pass constitutional muster.  First, notwithstanding Justice O'Connor's recognition of the values of religious pluralism in Allegheny County, government endorsement of one or any number of different religions is unconstitutional.  Second, a reasonable observer cannot be presumed to be aware of the various religious and cultural celebrations that take place throughout the year in Jersey City. Third, the City's policy of celebrating many different religions, while perhaps laudable, is a classic example of

---

11.    The ACLU also challenged the constitutionality of the display under the New Jersey Constitution.  In interpreting the New Jersey Establishment Clause, New Jersey courts have relied on Federal Establishment Clause jurisprudence.  See Ran-Dav's County Kosher, Inc. v. State, 608 A.2d 1353, 1358 (N.J. 1992).  Thus, we need not consider separately whether the displays are consistent with the New Jersey Constitution.

government entanglement with religion.  We will discuss each of these points in detail below.

*(1)  Endorsement of More Than One Religion*

The City, in support of its diversity/pluralism justification, relies on the following language from Justice O'Connor's concurrence in Allegheny County:

By accompanying its display of a Christmas tree -- a secular symbol of the Christmas holiday season -- with a salute to liberty, and by adding a religious symbol from a Jewish holiday also celebrated at roughly the same time of the year, I conclude that the city did not endorse Judaism or religion in general, but rather conveyed a message of pluralism and freedom of belief during the holiday season.

\* \* \*

A reasonable observer would, in my view, appreciate that the combined display is an effort to acknowledge the cultural diversity of our country and to convey tolerance of different choices in matters of religious belief or nonbelief by recognizing that the winter holiday season is celebrated in diverse ways by our citizens.  In short, in the holiday context, this combined display in its particular physical setting conveys neither an endorsement of Judaism or Christianity nor disapproval of alternative beliefs, and thus does not have the impermissible effect of "mak[ing] religion relevant, in reality or public perception, to status in the political community."

Allegheny County, 492 U.S. at 635-36 (quoting Lynch, 465 U.S. at 692 (O'Connor, J., concurring)).  The City maintains that Allegheny County stands for the proposition that government celebration of different religions is not in fact "endorsement" of religion that runs afoul of the Establishment Clause.

27

The City misreads Justice O'Connor's emphasis on pluralism and diversity. The menorah in Allegheny County, while viewed by Justice O'Connor as a religious symbol, was placed next to a Christmas Tree, which the Court (including Justice O'Connor) considered a secular symbol. Thus, Justice O'Connor concluded that the display, in context, endorsed neither Judaism or Christianity. The secular nature of the Christmas tree, concluded Justice O'Connor, converted the display into a celebration of diversity and pluralism and distinguished it from an endorsement of religion.

But it is important to note that Justice O'Connor's pluralism/diversity justification for the menorah and Christmas tree display in Allegheny County was not based on the fact that two different religions were represented in a display. She emphasized that the Christmas tree created a secular context emphasizing diversity and pluralism. It remains clear that government celebration of one particular religion, or even more than one religion, can constitute government endorsement of religion that violates the Establishment Clause by "sending a clear message to nonadherents that they are outsiders or less than full members of the political community." Allegheny County, 492 U.S. at 627 (O'Connor, J., concurring). We do not suggest that all government celebrations of diverse cultures need be free of all religious content. Indeed, such celebrations would likely be impossible given religion's inherent role in many different cultures. We merely recognize that government celebration of more than one religion cannot magically transform a government

28

endorsement of religion into a secular "celebration of diversity and pluralism."

### (2)   *The Perspective of the "Reasonable Observer"*

The City argues that the reasonable, informed observer of the original Jersey City display should be presumed to be aware of the City's year-round celebration of different cultures and religions.  According to the City, it should be apparent to such an informed observer that the display is a celebration of culture and not an endorsement of religion.

In discerning here the viewpoint of the "reasonable observer" we are asked to consider whether the observer is aware of the "history and context" of the challenged government activity.[12]  Justice O'Connor, for one, has not hesitated to impute a significant amount of knowledge of "history and context"

---

12.   Although we agree with the City that the endorsement test necessarily focuses on the perception of some formulation of a "reasonable observer," we note the nearly impossible task of giving content to the hypothetical reasonable observer in our multicultural society.  In his dissent in Allegheny County, Justice Brennan identified the risk of subjective construction of the viewpoint of the "reasonable observer":

> I shudder to think that the only "reasonable observer" is one who shares the particular views on perspective, spacing, and accent expressed in Justice Blackmun's opinion, thus making analysis under the Establishment Clause look more like an exam in Art 101 than an inquiry into constitutional law.

Allegheny County, 492 U.S. at 573 (Brennan, J., dissenting).

Indeed, in Capitol Square the concurring and dissenting Justices struggled over the definition of "reasonable observer," disagreeing over just how informed a reasonable observer needed to be.  See Kathleen M. Sullivan, Parades, Public Squares and Voucher Payments: Problems of Government Neutrality, 28 Conn. L. Rev. 243, 252-53 (1996).

to the reasonable observer.  See Capitol Square, 115 S. Ct. at 2455 (O'Connor, J., concurring); Wallace v. Jaffree, 472 U.S. 38, 76 (1985) (O'Connor, J., concurring).

Justice Stevens, in contrast, has rejected Justice O'Connor's "ideal" reasonable observer, finding her conception to be more akin to a "well-schooled jurist" than a mere reasonable observer.  Capitol Square, 115 S. Ct. at 2466 n.5 (Stevens, J., dissenting).  Explicitly rejecting the assumption that reasonable viewers are aware of the history of the public forum at issue, Justice Stevens noted that Justice O'Connor "apparently would not extend Establishment Clause protection to passers by who are unaware of Capitol Square's history."  Id. at 2470 n.14.

Moreover, several courts of appeal have refused to allow the "history and context" of a practice to trump an otherwise clear endorsement of religion that would be apparent to a so-called reasonable observer.  See Robinson v. City of Edmond, 68 F.3d 1226, 1232 (10th Cir. 1995) ("[A]n appeal to history . . . is indeed an argument which could always `trump' the Establishment Clause, because of the undeniable significance of religion and religious symbols in the history of many of our communities."); Ellis v. City of La Mesa, 990 F.2d 1518, 1525-26 (9th Cir. 1993) (refusing to consider the "historical significance" of a municipality's display of a cross in a city park); Harris v. City of Zion, 927 F.2d 1401, 1415 (7th Cir. 1991), cert. denied, 505 U.S. 1229 (1992) (striking a city seal containing Christian symbols and concluding that "[n]o appeal to

30

history can abate [a sectarian] message when the images in the seal are abstract symbols of a particular Christian sect").

We agree with Justice Stevens that assuming the reasonable observer is aware of "history and context" when viewing a municipality's religious display is "a highly unlikely supposition." Capitol Square, 115 S. Ct. at 2470 (Stevens, J., dissenting). In our view, when testing for endorsement, we must take into account the perspective of those citizens within the community who hold minority religious views.[13]

Thus, we cannot agree that an observer of the display who is a new resident to Jersey City, has no understanding of the history of the community, but has a strong sense of his or her own faith, a faith not depicted in the display, is somehow less "reasonable" an observer than the Christian or Jewish observer who has lived in Jersey City for twenty years. It follows that this new resident of Jersey City should be entitled to no less Establishment Clause protection than a long-time resident.

Accordingly, we conclude that the reasonable observer of Jersey City's display cannot be presumed to have knowledge of Jersey City's different cultural and religious celebrations. The City argues that the "reasonable observer" sees a "time lapse photograph" depicting Jersey City's various celebrations. This is a view that departs from reality. A reasonable observer of

---

13. For further discussion of this point, see Kent Greenawalt, *Quo Vadis: The Status and Prospects of "Tests" Under the Religion Clauses*, 8 Sup. Ct. Rev. 323, 374 (1995) (noting that the reasonable observer "should have only an ordinary amount of knowledge of the law and of the history of symbols in public places").

Jersey City's display stands before City Hall, flanked by two religious symbols: the crèche and the menorah. There are no other visual components, other than the sign proclaiming the City's celebration of diversity, that can give the observer the "time-lapse photograph" effect.[14] A general awareness of the City's celebration of diversity throughout the year is obscured by the physical presence of the symbols of Christianity and Judaism before City Hall.

*(3) Entanglement*

The City also argues that its erection of the crèche and the menorah are part of an overall plan to celebrate different religions and cultures. This argument must also fail. Put simply, Jersey City has pursued a quintessential type of government action that "fosters an excessive entanglement with religion." Lemon v. Kurtzman, 430 U.S. 602, 613 (1971).

In Aguilar v. Felton, 473 U.S. 402 (1985), the Court reaffirmed the continuing vitality of the "excessive entanglement" prong of the Lemon test. Aguilar involved a challenge to New York City's provision of funding for public

_____

14.  Counsel for the City rely heavily on the "secularizing" power of the sign accompanying the display. Again, the sign read, "[t]hrough this display and others throughout the year, the City of Jersey City is pleased to celebrate the diverse cultural and ethnic heritages of its peoples." See City Br. 17; City Reply Br. 11; Oral Arg. Tr. 20, 22, 58, 63, 66. The Supreme Court has recognized, however, that "no sign can disclaim an overwhelming message of endorsement." Allegheny County, 492 U.S. at 619. We conclude, therefore, that the sign cannot "secularize" the display, or dilute its message of endorsement, merely because it conveys to the reasonable observer that the City engages in year-round celebrations of different cultures and religions.

32

school instructors who taught remedial classes to private school students in private school classrooms. An overwhelming majority of the participating private schools were religiously affiliated. New York City adopted a supervisory system designed to monitor the classes to ensure that public funds were not used to inculcate religious beliefs. In holding that New York City's program violated the Establishment Clause, the Court stated:

> This pervasive monitoring by public authorities in the sectarian schools infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement. Agents of the city must visit and inspect the religious school regularly, alert for the subtle or overt presence of religious matter in Title I classes. In addition, the religious school must obey these same agents when they make determinations as to what is and what is not a "religious symbol" and thus off limits in a Title I classroom. In short, the religious school, which has a primary purpose of the advancement and preservation of a particular religion must endure the ongoing presence of state personnel whose primary purpose is to monitor teachers and students in an attempt to guard against the infiltration of religious thought.

Id. at 413 (citation omitted) (emphasis added).

Even if we were to conclude that the City could avoid the "endorsement" of religion by implementing its plan to celebrate many different religions and cultures, it could not avoid an excessive entanglement with religion in the implementation. Such a plan would necessitate judgments regarding which religious and cultural holidays to celebrate, which religious and cultural symbols appropriately conveyed the proper non-sectarian message, and decisions regarding the relative importance and cultural components of different

33

religions.  In carrying out this plan, Jersey City Mayor

Schundler would have to address significant questions regarding

specific religions:  Should a rabbi and a priest be consulted

when erecting the menorah and the crèche?  Should a ceremony

accompany the erection of these religious symbols?  Should the

City employ a Muslim cleric during Ramadan Observance Month to

avoid offending a theological protocol of Islam?[15]

Another troubling aspect of entanglement pinpointed by

the Court in Aguilar is the very proper and legitimate concern

that governmental involvement in such decisions will alienate

certain members of the political community.  The Court commented
that:

> The numerous judgments that must be made by agents of the city concern matters that may be subtle and controversial, yet may be of deep religious significance to the controlling denominations.  As government agents must make these judgments, the dangers of political divisiveness along religious lines increase.

Aguilar, 473 U.S. at 414.

---

15.   Our analysis does not require consideration of the motives of Mayor Schundler himself.  Our concern runs deeper and is focused on the dangers associated with placing the power to make religious judgments in the hands of government officials.  On this point, we remain guided by Justice Black, who wrote:

> The Establishment Clause thus stands as an expression of the principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its "unhallowed perversion" by a civil magistrate.

Engel v. Vitale, 370 U.S. 421, 432 (1962).

34

Jersey City, in implementing its plan to celebrate the diversity and pluralism of various religions and cultures, would obviously encounter the types of decisions that would produce political divisiveness. Many adherents of religions other than Christianity and Judaism would likely feel politically alienated if the City were unwilling to erect a display commemorating their particular religion. Moreover, the City's continuing role in deciding how to celebrate various religions will be, in reality, inevitably guided by politics. For example, it would be unlikely that Mayor Schundler (or any other head of a municipality) would erect a display that would offend a majority of his constituents.[16] That such a political calculation is possible confirms that these types of religious judgments should not be placed in the hands of an elected official.

Thus, we conclude that the City's plan to celebrate many different religions and cultures would amount to a constitutionally impermissible entanglement of government and religion.

IV.

The Second Display (adding Santa, Frosty, and the Red Sled)

The district court, in its December 21, 1995 order, permitted Jersey City's display of a crèche, a menorah, Frosty

---

16.    Justice Powell identified this as a concern in his concurrence in Aguilar, commenting that "[i]n States . . . that have large and varied sectarian populations, one can be assured that politics will enter into any state decision to aid parochial schools." Aguilar, 473 U.S. at 416 (Powell, J., concurring).

35

the Snowman, Santa, and a red sled. As we noted earlier, the district court stated:

I conclude that by making these additions defendants have sufficiently demystified the [holy], they have sufficiently desanctified sacred symbols, and they have sufficiently deconsecrated the sacred to escape the confines of the injunctive order in this case.

Tr. at 12. The district court modified its November 28 order by requiring Jersey City to maintain the additional secular figures (Frosty and Santa) in the display. If Frosty, Santa, and/or the sled were stolen or destroyed, they were to be replaced within twenty-four hours.

Without opinion, the district court apparently determined that the presence of Frosty, Santa, and a sled cleansed the display of its sectarian qualities. In so holding, the district court summarily concluded that the modified display was constitutional under Lynch and Allegheny County. ACLU of N.J. v. Schundler, No. 95-206 (D.N.J. Dec. 21, 1995) (order denying preliminary injunction).

This summary conclusion is particularly troubling given the Supreme Court's emphasis in Lynch and Allegheny County on the importance of analyzing the specific context of the challenged display. The district court offered no assessment of the demystifying powers of Frosty the Snowman or Santa Claus, or even the sled. That is, the court did not explain how the context of the second display "demystified" the impermissible religious content (the crèche and menorah) of the original display. Moreover, we are puzzled as to the origin of the district court's

36

"demystification" (or "desanctification") analysis.  Under Allegheny County, the relevant analysis focuses on whether the content and context of the display would convey a message of government endorsement of religion.  While true that the Court in Allegheny County found the menorah and Christmas tree display to convey a secular message, the Court has never suggested that the demystification powers of certain secular figures could diminish the religious message conveyed by sectarian symbols.[17]  As such, we conclude that the district court erred in determining that the constitutionality of the modified display depended on whether the presence of Frosty and Santa "demystified" the crèche and the menorah.[18]

We also note that, in our view, Allegheny County does not compel the result reached by the district court.  Allegheny County did not create a per se rule that a "secular" symbol placed next to a "religious" symbol is constitutional.  The content of the Allegheny County display was arguably secular. While Justice O'Connor recognized that the menorah is a religious

---

17.   If adopted, the district court's "demystification" approach would lead federal courts and municipal officials to engage in an ad hoc, arbitrary, constitutional guessing game over the relative secularizing "power" of individual symbols.  For example, a city mayor would be forced to decide whether the addition of a plastic candy cane would be enough to bring a crèche display in compliance with the Establishment Clause, or whether he or she would also need to add a string of lights.  As a practical matter, we find it unlikely that these difficult questions of constitutional magnitude can be solved by a plastic Santa or Frosty.

18.   We note that both the ACLU and the City agree that the district court's "demystification" approach was flawed.  ACLU Br. at 38; City Br. at 15.

37

symbol, she also recognized that a depiction of a Christmas tree and a menorah may invoke an image of different individuals celebrating the holidays at the end of the calendar year. Allegheny County, 492 U.S. at 635 (O'Connor, J., concurring). This time of year is, at least in this country, widely regarded as "the holiday season."  Thus, Justice O'Connor recognized that a Christmas tree and a menorah, in the context they were presented in Allegheny County, endorsed only a secular recognition of the holiday season.  Id. at 635–36.

Government display of a crèche, on the other hand, cannot convey a meaning separate from the very act it is meant to portray.  A crèche depicts the Birth of Christ, the event that lies at the foundation of Christianity.  In Allegheny County, the Court determined that displays containing a crèche as a primary focal point, which are situated at the seat of government, are constitutionally impermissible as they convey a message of government endorsement.  This is consistent with Lynch, in which the Court permitted a crèche that was part of a display in a private park depicting a "winter wonderland" scene because, in context, there were no external indicia of government endorsement.

As we have discussed, the Supreme Court, in its myriad of approaches in the display cases, has repeatedly emphasized the importance of examining the context of the display at issue to determine whether it has the effect of endorsing religion.  In ACLU of New Jersey v. Black Horse Pike Regional Board of Education, we discussed Allegheny County and Lynch to illustrate

"the importance of the context of a challenged practice" in conducting an Establishment Clause analysis.  <u>ACLU of N.J. v. Black Horse Pike Reg. Bd. of Educ.</u>, 84 F.3d 1471, 1484 (3d Cir. 1996).  The context of Jersey City's second display is as follows:  on one side, a large menorah stands about ten feet from a four-foot plastic Santa and a Christmas tree decorated with lights and Kwanzaa symbols; on the other side, the characters of the crèche are huddled off to the side of a manger, with Frosty in the background bearing witness and separated from the crèche by a red sled.  The token additions of the secular symbols do little to alter the "context" or the focal points of the City's display.  We reiterate that Jersey City's display of the crèche at the seat of City government power impermissibly conveyed a message of government endorsement of religion.  And, in our view, the City's addition of Santa, Frosty, and a red sled did little to secularize that message.[19]

---

19.   The ACLU, in its brief, artfully addresses the district court's Establishment Clause analysis by stating that:

> [A]t most, a reasonable observer would construe [Frosty and Santa] to be background witnesses to the Miracle of the Oils and the Birth of Christ, respectively.  However confusing the presence of a snowman in Bethlehem may be from a canonical perspective, a reasonable observer informed of the history and context of religious displays in front of City Hall would invariably characterize them for what they
>
> are – attempts at evasion of constitutional prohibitions through superficial secular tokenism.

ACLU Br. at 17.

39

The difficulty presented by the district court's hypertechnical Establishment Clause analysis is exacerbated by its requirement in the injunction that Santa, Frosty, and the sled were to be replaced within twenty-four hours if any of them were removed from the display. Apparently, the district court found the constitutional "demystification" powers of Frosty, Santa, and the sled to be so great that their absence for one day would transform the display back into a government endorsement of religion. This reinforces the plain fact that the district court was convinced that the presence of two, four-foot plastic figurines of Frosty and Santa, along with a red wooden sled, "demystified" the religious message conveyed by the City's erection of a display commemorating the Birth of Christ and the Miracle of the Oils. We conclude that this simply cannot form the basis of sound constitutional analysis.

V.

Accordingly, we hold that the City of Jersey City's display of a crèche and a menorah on the lawn in front of its City Plaza violated the Establishment Clause. We also hold that the district court erred in modifying the injunction based upon its conclusion that the addition of Frosty, Santa, and a red sled "demystified" the religious meaning of the crèche and the menorah and rendered the display constitutional. As such, we vacate the district court's modified injunction order and remand the case so that the district court can consider, consistent with the standards set forth in this opinion, whether the modified display was constitutional.

American Civil Liberties Union of New Jersey, et al. v. Bret Schundler, et al.  Nos. 95-5865, 95-5866 and 96-5023

McKee, Circuit Judge Concurring.

I agree with the reasoning of my colleagues and therefore join in their opinion. However, I think it necessary to state that I think that our analysis here should be defined by the parameters of Allegheny County v. ACLU, 492 U.S. 573 (1989); Lynch v. Donnelly, 465 U.S. 668 (1984); and Lemon v. Kurtzman, 403 U.S. 602 (1971). I do not think that Capitol Square Review & Advisory Board v. Pinette, ___ U.S. ___, 115 S. Ct. 2440, 132 L.Ed.2d 650 (1995), assists us.

In Capitol Square, a "10-acre, state-owned plaza surrounding the Statehouse" in the capitol city of Ohio had been "used for public speeches, gatherings, and festivals advocating and celebrating a variety of causes, both secular and religious" for over a century. Id. at 2444.  By statute, the square was

42

available for use by "the public . . . for free discussion of public questions, or activities of broad public purpose," and the Capitol Square Review and Advisory Board was given the responsibility for regulating public access.  (internal quotations omitted).  Id. at 2440. That Board rejected a request by Donnie Carr, the local leader of the Klu Klux Klan, to erect a display consisting of an unattended cross, and Carr appealed to the federal courts alleging a violation of the Constitution.  In reviewing that decision, the Supreme Court limited itself to the Establishment Clause issue even though Carr argued that the state's real reason for rejecting the request was its disapproval of the Klan's political views. Thus, the only issue the Court discussed was the state's right to limit private speech on public property that had historically been used as an open public forum.

The Court began its analysis by noting that "[r]espondents' religious display in Capitol Square was private expression." Id. at 2446. That expression was clearly entitled to protection regardless of content. "[W]e have not excluded from free-speech protections religious proselytizing. . . ." Id. The city defended its rejection of the requested display by arguing that it had an interest in avoiding official endorsement of Christianity under the Establishment Clause. The Court relied in part upon the "endorsement test" and its prior holding in Allegheny and Lynch to reject that position.

> We find it peculiar to say that government 'promotes' or 'favors' a religious display by giving it the same access to a public forum that all other displays enjoy. . . . And as a matter of Establishment Clause jurisprudence,

43

> we have consistently held that it is no
> violation for government to enact neutral
> policies that happen to benefit religion.

Id. at 2447. Accordingly, I do not think that Capitol Square illuminates our present inquiry. Our analysis does not involve private speech. Rather, here, the City itself owned and erected the display at issue.

Nevertheless, as the majority quite correctly points out, Lynch and Allegheny require the result we reach here today. Furthermore, as my colleagues note, in Lemon, the Supreme Court held that the Establishment Clause requires that state action 1) have a secular purpose; 2) have a primary effect that neither advances nor inhibits religion; and 3) avoid excessive government entanglement with religion. Lemon, 403 U.S. 612–13. I think my colleagues' analysis of Lynch and Allegheny establishes that the first display is inconsistent with the prohibitions of Lemon and properly remands to determine the legality of the second display. Accordingly, I join the opinion with the reservations noted herein.