OPINION OF THE COURT
ALITO, Circuit Judge.
This appeal concerns the constitutionality of two Jersey City “holiday” displays. The first, which featured a menorah and a Christmas tree, was annually placed in front of City *95 Hall for several decades. In 1995, the District Court permanently enjoined the City from continuing the practice of erecting this or any substantially similar display, see ACLU of N.J. v. Schundler, 931 F.Supp. 1180 (D.N.J.1995), and a prior panel of our court affirmed that decision. ACLU of N.J. v. Schundler, 104 F.3d 1435, 1444-50 (1997). Jersey City subsequently moved for relief from that order under Rule 60(b)(5) of the Federal Rules of Civil Procedure, contending that the Supreme Court’s intervening decision in Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), had undermined the panel’s reasoning. The District Court denied this motion, and we now affirm that decision.
Jersey City also challenges the District Court’s most recent decision regarding a modified holiday display that the City put up after the original display was enjoined. The modified display contained not only a creche, a menorah, and Christmas tree, but also large plastic figures of Santa Claus and Frosty the Snowman, a red sled, and Kwanzaa symbols on the tree. In addition, the display contained two signs stating that the display was one of a series of displays put up by the City throughout the year to celebrate its residents’ cultural and ethnic diversity. We find this modified display to be indistinguishable in any constitutionally significant respect from the displays upheld by the Supreme Court in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), and County of Allegheny v. ACLU, Greater Pittsburgh Chapter, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (hereinafter “Allegheny County ”), and we therefore hold that Jersey City’s modified display is likewise constitutional.
I.
From at least 1965 until 1995, the City of Jersey City commemorated the winter holiday season by displaying a creche and a menorah on city property in front of City Hall. The creche and menorah were owned, maintained, and stored by the City. The creche, which was displayed during the period preceding and following Christmas, included a manger that measured 11’ 9” by 7’ by 4’ 4”. It also included figures of Mary, Joseph, the Baby Jesus, and the Three Wise Men; these varied in height from 12” to 27”. Surrounded by a post-rail fence, the creche was placed on the right side of City Hall. The menorah, measuring 19’ by 14’, was displayed during Chanukah on the left side of City Hall. (Also on the left-side of the lawn was a 13’ Christmas tree, but this apparently escaped the District Court’s attention.[1]) Because the date of Chanukah generally falls near that of Christmas, the creche and menorah were usually displayed simultaneously, but in 1994, when the plaintiffs commenced this suit, Chanukah began unusually early, on November 28, and therefore the menorah was taken down shortly before the creche went up.[2]
When Jersey City erected its traditional display in 1994, the American Civil Liberties Union sent the City a letter asking it to discontinue its practice of displaying religious symbols on public property. In response, the City placed a sign adjacent to the display stating: “Through this display and others throughout the year, the City of Jersey City is pleased to celebrate the diverse cultural and ethnic heritages of its peoples.” Jersey City maintains that the sign’s reference to other events refers to, among other things, the City’s annual commemoration of Ramadan, the annual Grand Phagwah Parade held to celebrate the Hindu New Year, and a wide variety of cultural events related to the many diverse ethnic groups in the City.
On December 21, 1994, the ACLU and other plaintiffs filed a complaint in state court against the City, the mayor, and the city council (hereinafter collectively “the City”), challenging the City’s display under the federal and state constitutions.[3] In Jan *96 uary 1995, the City removed the action to the District • Court, and on November 28, 1995, the District Court granted the plaintiffs’ motion for summary judgment and held that the City’s display violated the Establishment Clause of the federal Constitution, as well as a parallel state constitutional provision. The District Court permanently enjoined the City from erecting its traditional display or any substantially similar scene or display at the front entrance of City Hall or on other property that the City owned, maintained, or controlled.
The City announced that it would appeal the decision, but in the meantime, on December 13, 1995, it erected a modified display that included, in addition to the elements in the previous display, a 4’ tall plastic figure of Santa Claus, a 3’ 10” tall plastic figure of Frosty the Snowman, a 4’ tall sled, Kwanzaa symbols on the tree, and two signs, each approximately 2’ by 3’, stating: “Through this display and others throughout the year, the City of Jersey City is pleased to celebrate the diverse cultural and ethnic heritages of its peoples.” See Appendix A (display on left side of City Hall); Appendix B (display on right side of City Hall); Appendix C (map of display).
The plaintiffs then moved to have the City held in contempt of the District Court’s injunction, and they also sought a preliminary injunction against the modified display. On December 18, the District Court denied these requests, concluding that the addition of the secular symbols rendered the modified display constitutionally unobjectionable. Ruling quickly, the District Court did not analyze the modified display at length but wrote:
I conclude that by making these additions defendants have sufficiently demystified the [holy], they have sufficiently desancti-fied sacred symbols, and they have sufficiently deconsecrated the sacred to escape the confines of the injunctive order in this case.
On appeal, a panel of our court affirmed the District Court’s decision regarding the. original display. 104 F.3d at 1444-50. The panel noted the religious significance of the creche and the menorah, as well as the City’s annual expenditure of some public funds to erect and maintain the display. Id. at 1445. The panel concluded that “the [original] display cannot be viewed as anything but a constitutionally impermissible dual endorsement of Christianity and Judaism.” 104 F.3d at 1446.
The panel cited three reasons for rejecting the City’s argument that the display was not an endorsement of Christianity and Judaism but part of the City’s year-long celebration of its people’s many different religious and ethnic backgrounds. 104 F.3d at 1446-50. The panel concluded (a) that government endorsement of many different religions violated the Establishment Clause, id. at 1447, (b) that a reasonable observer, viewing the holiday display, would not be aware of the City’s other religious and cultural celebrations at other times of the year, id. at 1447-49, and (c) that the City’s policy of celebrating many different religions was a quintessential example of government entanglement with religion. Id. at 1449-50. In reaching the latter conclusion regarding entanglement, the prior panel relied chiefly on Aguilar v. Felton, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). See 104 F.3d at 1449-50.
Turning to the modified display, the panel held that the District Court’s analysis was incorrect. 104 F.3d at 1450-52. The panel found no basis in Supreme Court cases for what it termed the District Court’s “ ‘demystification’ approach,” and the panel notéd that the parties agreed that this approach was “flawed.” Id. at 1450-51 & nn. 17-18. The panel “conclude[d] that the district court erred in determining that the constitutionality of the modified display depended on whether the presence of Frosty and Santa ‘demystified’ the creche and the menorah.” Id. at 1451 (footnote omitted). The panel therefore remanded the case for the District Court to analyze the modified display pursuant to the proper standards. Id. at 1452. But while remanding the question of the' constitutionality of the modified display for reconsideration by the District Court, the panel also spent several paragraphs expressing in dicta a skeptical view about the constitutionality of the modified display. Id. at 1451-52.
*97 On remand, the plaintiffs moved for summary judgment and a permanent injunction barring the modified display. The defendants cross-moved for summary judgment and also filed a motion under Fed.R .Civ.P. 60(b)(5) for relief from the District Court’s earlier injunction on the ground that the Supreme Court’s decision in Agostini, which overruled Aguilar, had undermined the panel’s reasoning. Specifically, the defendants pointed to the panel’s reliance on the concept of “entanglement” and the Supreme Court’s decision in- Agostini that entanglement should no longer to be considered an independent test but should be viewed along with other factors as “an aspect of the inquiry into ... effect.” 521 U.S. at 233, 117 S.Ct. at 2015.
Reversing its prior position, the District Court granted summary judgment for the plaintiffs and held that the modified display violated the Constitution. The Court wrote that the panel’s “discussion of the context of the display after the addition of Frosty the Snowman, Santa and a red sled leaves little doubt that it would conclude on the basis of the facts in the record before it that even after these additions the display communicates the City’s endorsement of Christianity and Judaism in violation of the Establishment Clause.” The District Court also denied the defendants’ motion for Rule 60(b)(5) relief, and the defendants then took this appeal.
II.
We first consider the City’s challenge to the denial of its Rule 60(b)(5) motion. Under that rule, a court may relieve a party from a final judgment or order when “it is no longer equitable that the judgment should have prospective application.” Fed.R.Civ.P. 60(b)(5). A party can show that a judgment should no longer have prospective application if it can demonstrate “a significant change in either factual conditions or the law.” Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).
In Agostini, the Supreme Court modified the Establishment Clause test articulated in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which asked (1) whether a challenged government practice had a secular purpose, (2) whether its principal or primary effect advanced or inhibited religion, and (3) whether it created an excessive entanglement of the government with religion. See ACLU of N.J. v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1483 (3d Cir.1996). The Agos-tini Court stated that Lemon’s entanglement prong is best understood and treated “as an aspect of the inquiry into a statute’s effect.” Agostini, at 233, 117 S.Ct. at 2015. While this statement merges the entanglement prong with the effect prong, it does not mean that considerations of excessive entanglement have been entirely deleted from Establishment Clause analysis; in Agostini, the Court analyzed the factors regarding entanglement at length. See id. at 232-36, 117 S.Ct. at 2015-16. Rather, the statement appears to mean that entanglement, standing alone, will not render an action unconstitutional if the action does not have the overall effect of advancing, endorsing, or disapproving of religion. See id.
Since entanglement analysis is still part of the Establishment Clause inquiry, the mere fact that the prongs have been merged is insufficient to undermine the prior panel’s decision regarding the original Jersey City display. The City and amicus curiae Chabad of Pittsburgh point out, however, that the prior panel’s entanglement analysis relied on two rationales that the Supreme Court rejected in Agostini. First, the prior panel stated that the City’s display policy would foster excessive interactions between municipal officials and local religious leaders in implementing the policy.[4] 104 F.3d at 1449-50. Second, the prior panel reasoned that *98 the City’s displays would “produce political divisiveness.” Id. at 1450. The Agostini Court addressed these same.two factors in considering the constitutionality of New York City’s “Title I” program,[5] under which public school teachers are sent into parochial schools to provide remedial education to disadvantaged children, and the Court held that these two factors “are insufficient by themselves to create an ‘excessive’ entanglement” under its “current understanding of the Establishment Clause.” 521 U.S. at 233, 117 S.Ct. at 2015.
While we are inclined to agree with the City and amicus curiae Chabad of Pittsburgh that the prior panel’s entanglement analysis is no longer valid in the wake of Agostini, it does not follow that Rule 60(b)(5) relief was required. Before discussing entanglement at all, the prior panel concluded that Jersey City’s original display violated the Establishment Clause because it “communicate[d][an] endorsement of Christianity and Judaism ....” 104 F.3d at 1446. If this conclusion is accepted, the original display is unconstitutional irrespective of the presence or absence of excessive entanglement. Accordingly, we agree with the District Court that Rule 60(b)(5) relief was not required.
III.
We therefore turn to the question of the modified display. As noted, the District Court, after initially upholding this display, reached the opposite conclusion on remand. Not unreasonably, the District Court interpreted ■ certain statements in the prior panel opinion to mean that the panel viewed the modified display as constitutionally dubious. We conclude, however, that the statements on which the District Court relied were merely dicta, that the prior panel did not render a decision regarding the constitutionality of the modified display, and that we are therefore obligated to analyze that question in accordance with our own best independent judgment.[6]
As previously noted, when the modified display was first challenged in the District Court, that Court was required to rule on an expedited basis, and the Court was therefore unable to provide a lengthy, detailed explanation of its conclusion that the display satisfied Establishment Clause standards. Instead, the District Court summarily stated that by adding additional objects to the original display, the City had, in the Court’s view, “sufficiently demystified the [holy], ... sufficiently desanctified sacred symbols, and ... sufficiently deconsecrated the sacred.” As both sides recognized in the prior appeal and as the panel held, see 104 F.3d at 1451 & n. 18, this analysis did not comport with Lynch or Allegheny County and finds no support in Establishment Clause jurisprudence. Demystification, de-sanctification, and deconsecration suggest a process of profanation, something that the *99 Establishment Clause neither demands nor tolerates. See, e.g., Lemon, 408 U.S. at 612, 91 S.Ct. 2105 (government conduct violates Establishment Clause if its primary effect is to advance or inhibit religion).
Emphasizing the insufficiency of the District Court’s “demystification” analysis, the prior panel “conclude[d] that the district court erred in determining that the constitutionality of the modified display depended on whether the presence of Frosty and Santa ‘demystified’ the creche and the menorah.” 104 F.3d at 1451. The panel therefore vacated the District Court’s modified injunction order and remanded the ease “so that the district court [could] consider, consistent with the standards set forth in [its] opinion, whether the modified display was constitutional.” Id. at 1452. Since no facts were in dispute, the prior panel itself certainly could have ruled on the constitutionality of the modified display. Moreover, since the relevant facts are relatively simple and were set out in full detail in the panel’s opinion, see id. at 1437-38, the prior panel was in just as good a position as the District Court to decide that question in the first instance. Yet the prior panel chose not to take that course, instead remanding for the District Court to make that decision. In light of this remand, it is apparent that the prior panel did not foreclose us from ruling on the constitutionality of the modified display in accordance with our own best independent judgment. We entirely agree with Judge McKee’s summary of the majority holding. In concurrence, Judge McKee wrote:
I think my colleagues’ analysis of Lynch and Allegheny establishes that the first display is inconsistent with the prohibitions of Lemon and properly remands to determine the legality of the second display.
104 F.3d at 1453 (emphasis added).
We thus reject the plaintiffs’ suggestion that the prior panel “formally remanded the issue of the Modified Display to the district court” but “in effect already answered the question it ostensibly remanded.” Appellees’ Br. at 6, 8 (emphasis added). There is no such thing as an ostensible remand, and that is not what the prior panel purported to do. The prior panel in fact remanded the question of the constitutionality of the modified display, thus leaving the question open and requiring us to decide that question for ourselves.
For these reasons, the dissent’s chastisements about “evad[ing] the reasoning of [the] prior panel” (Dissent at 114) are mistaken. We have scrupulously followed what is “binding” upon us: the prior panel’s “holding” (see IOP 9.1), i.e., that the original display was unconstitutional and the District Court, in judging the second display, employed incorrect standards. As for the prior panel’s comments about the modified display, the dissent itself acknowledges that these were expressed “in dictum” (Dissent at 114), but the dissent would apparently have us follow these non-binding statements rather than Supreme Court precedent, viz., Lynch and Allegheny County. This we cannot do.
IV.
The Supreme Court has handed down two decisions concerning the constitutionality of municipal holiday displays, and therefore it is to these decisions that we must primarily look for guidance in evaluating Jersey City’s modified display.
A. In Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Court upheld the constitutionality of a holiday display erected by the City of Pawtucket, Rhode Island. “[S]ituated in a park owned by a nonprofit organization and located in the heart of the shopping district,” the display was characterized by the Court as “essentially like those to be found in hundreds of towns or cities across the Nation — often on public grounds — during the Christmas season.” Id. at 671, 104 S.Ct. 1355. The display consisted of “many of the figures and decorations traditionally associated with Christmas, including, among other things, a Santa Claus house, reindeer pulling Santa’s sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads ‘SEASONS GREETINGS,’ and [a] créche.” Id. All components of the display were owned by the City. Id. *100 The City had purchased the creche some years earlier for $1365, and the City incurred a small annual expense in erecting, lighting, and dismantling the creche. Id.
Writing for the Court, Chief Justice Burger analyzed the‘inclusion of the creche in the Pawtucket display under the Lemon test and thus, inquired whether the inclusion of the creche had a secular purpose, whether its principal or primary purpose was to advance or inhibit religion, and whether it created an excessive entanglement of government with religion. See 465 U .S. at 679, 104 S.Ct. 1355. The Court held that the Pawtucket display had a secular purpose, explaining:
The city ... has principally taken note of a significant historical religious event long celebrated in the Western World. The creche in the display depicts the historical origins of the traditional event long recognized as a National Holiday.... The display is sponsored by the City to celebrate the Holiday and to depict the origins of that Holiday. These are legitimate secular purposes.
Id. at 680-81, 104 S.Ct. 1355 (footnote omitted).
The Court likewise held that the inclusion of the creche did not have the principal or primary effect of advancing religion. 465 U.S. at 681-83, 104 S.Ct. 1355. Noting that prior Establishment Clause cases had upheld various forms of aid to students attending church-related schools and colleges, tax exemptions for church property, Sunday Closing laws, “release time” programs, and legislative prayers, the Court was “unable to discern a greater aid to religion deriving from inclusion of the creche than from these benefits and endorsements previously held not violative of the Establishment Clause.” Id. at 682, 104 S.Ct. 1355. The Court concluded that if the inclusion of the creche provided some “benefit to one faith or religion or to all religions,” the effect was “indirect, remote and incidental.” Id. at 683, 104 S.Ct. 1355.
Finally, the Court held that there was no impermissible entanglement. 465 U.S. at 683-85, 104 S.Ct. 1355. The Court saw no “administrative entanglement” and observed that there was “no evidence of contact with church authorities concerning the content or design of the exhibit.” Id. at 684, 104 S.Ct. 1355. The Court also noted that the cost of including the creche was small. Nor did the Court see a basis for finding an excessive entanglement due to political divisiveness. Id. at 684-85, 104 S.Ct. 1355. The Court rejected the idea that political divisiveness alone could “serve to invalidate otherwise permissible conduct.” Id. at 684, 104 S.Ct. 1355. Observing that the inclusion of the creche had produced no marked dissension prior to the lawsuit then before it, the Court pointedly wrote that “[a] litigant cannot, by the very act of commencing a lawsuit ... create the appearance of divisiveness and then exploit it as evidence of entanglement.” Id. at 684-85,104 S.Ct. 1355.[7]
Justice O’Connor, who joined the opinion of the Court and cast the critical fifth vote in favor of the constitutionality of the Pawtuck-et display, wrote a concurring opinion “to suggest a clarification of ... Establishment Clause doctrine.” Id. at 687, 104 S.Ct. 1355 (O’Connor, J., concurring). She pointed out, however, that she viewed the Court’s opinion as “consistent with” her analysis. Id.
Justice O’Connor wrote that government “can run afoul of [the Establishment Clause] in two principal ways”: by means of an “excessive entanglement with religious institutions” and by “government endorsement or disapproval of religion.” 465 U.S. at 687-88, 104 S.Ct. 1355. In the Pawtucket case, Justice O’Connor found “no institutional entanglement,” and she stated that “political divisiveness along religious lines should not be an independent test of constitutionality.” Id. at 689, 104 S.Ct. 1355. “The central issue in [the] case,” she stated, was “whether Paw-tucket ha[d] endorsed Christianity by its display of the creche.” Id. at 690, 104 S.Ct. 1355. “To answer that question,” she continued, it was necessary to “examine both what Pawtucket intended to communicate in displaying the creche and what message the *101 city’s display actually conveyed.” Id. She found that “Pawtucket did not intend to convey any message of endorsement of Christianity or disapproval of non-Christian religions.” Id. at 691, 104 S.Ct. 1366. She explained:
The evident purpose of including the creche in the larger display was not promotion of the religious content of the creche but celebration of the public holiday through its traditional symbols. Celebration of public holidays, which have cultural significance even if they also have religious aspects, is a legitimate secular purpose.

Id.

Justice O’Connor also concluded that Paw-tucket’s display of the creche did not “communicate a message that the government intend[ed] to endorse the Christian beliefs represented by the creche.” Id. at 692, 104 S.Ct. 1355. She wrote:
Although the religious and indeed sectarian significance of the créche ... is not neutralized by the setting, the overall holiday setting changes what viewers may fairly understand to be the purpose of the display — as a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content. The display celebrates a public holiday, and no one contends that declaration of that holiday is understood to be an endorsement of religion. The holiday itself has very strong secular components and traditions. Government celebration of the holiday, which is extremely common, generally is not understood to endorse the religious content of the holiday, just as government celebration of Thanksgiving is not so understood. The creche is a traditional symbol of the holiday that is very commonly displayed along with purely secular symbols, as it was in Pawtucket.

Id.

Four Justices — Justices Brennan, Marshall, Blackmun, and Stevens — dissented, concluding that the Pawtucket display did not have a secular purpose, 465 U.S. at 698-701, 104 S.Ct. 1355 (Brennan, J., dissenting), had the primary effect of placing “the government’s imprimatur of approval on the particular religious beliefs exemplified by the creche,” id. at 701, 104 S.Ct. 1355, and “pose[d] a significant threat of fostering ‘excessive entanglement.’ ” Id. at 702, 104 S.Ct. 1355.
B. The Supreme Court’s second decision concerning holiday displays came five years later in County of Allegheny v. ACLU, Greater Pittsburgh Chapter, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), aff'g in part and rev’g in part, ACLU, Greater Pittsburgh Chapter v. Allegheny County, 842 F.2d 655 (3d Cir.1988). At issue were two displays on public property in downtown Pittsburgh. The first was situated on the Grand Staircase of the Allegheny County Courthouse, a spot described as the “most public” and “most beautiful” part of that building. 492 U.S. at 579, 109 S.Ct. 3086. This display consisted of a creche, a banner proclaiming “Gloria in Exeelsis Deo!” (“Glory to God in the highest!”), some poinsettias, a “small” decorated evergreen, and a plaque stating that the display had been donated by the Holy Name Society, a Roman Catholic group. Id. at 580, 109 S.Ct. 3086. “No figures of Santa Claus or other decorations appeared on the Grand Staircase.” Id. at 580-81, 109 S.Ct. 3086. (A picture of this display appears at 492 U.S. at 622, 109 S.Ct. 3086, Appendix A.)
Five Justices — the four Lynch dissenters plus Justice O’Connor — held that this display violated the Establishment Clause. Writing for the Court with respect to this issue, see 492 U.S. at 588-92, 109 S.Ct. 3086, Justice Blackmun took pains to distinguish the Allegheny County Courthouse display from the display uphéld in Lynch. “[Ujnlike in Lynch,'" he wrote, “nothing in the context of the display detracts from the creche’s religious message.” Id. at 598, 109 S.Ct. 3086. He noted that the creche stood “alone” as “the single element of the display on the Grand Staircase” and that “[tjhe presence of Santas, or other Christmas decorations elsewhere” in the courthouse “fail[edj to negate the endorsement effect of the creche.” Id. at 598-99 & n. 48, 109 S.Ct. 3086. Justice Blackmun rejected the suggestion that the “floral decoration surrounding the creche” could “be viewed as somehow equivalent to *102 the secular symbols in the overall Lynch display.” Id. at 599, 109 S.Ct. 3086. He concluded:
In sum, Lynch teaches that government may celebrate Christmas in some manner and form, but not in a way that endorses Christian doctrine. ' Here, Allegheny County has transgressed this line. It has chosen to celebrate Christmas in a way that has the effect of endorsing a patently Christian message: Glory to God for the birth of Jesus Christ. Under Lynch, and the rest of our cases, nothing more is required to demonstrate a violation of the Establishment Clause. The display of the creche in this context, therefore, must be permanently enjoined.
Id. at 601-02, 109 S.Ct. 3086.
In a separate concurrence, Justice O’Con-nor similarly distinguished Lynch, stating that “[i]n contrast to the creche in Lynch, which was displayed in a private park in the city’s commercial district as part of a broader display of traditional secular symbols of the holiday season, this créche st[ood] alone in the county courthouse” and had the “unconstitutional effect of conveying a government endorsement of Christianity.” 492 U.S. at 627, 109 S.Ct. 3086 (O’Connor, J., concurring). Three of the Lynch dissenters — Brennan, Marshall and Stevens — were of the view that the display of religious symbols on government property necessarily sends a message favoring religion. 492 U.S. at 637-46, 109 S.Ct. 3086 (Brennan, J., concurring in part and dissenting in part); id. at 646-55, 109 S.Ct. 3086 (Stevens, J., concurring in part and dissenting in part). In an opinion by Justice Kennedy, four Justices dissented and would have upheld the courthouse display. 492 U.S. at 655-79, 109 S.Ct. 3086.
A splintered majority of the Court reached a different conclusion concerning the second display at issue in Allegheny County, which was located in front of the City-County Building. (A picture of this display appears at 492 U.S. at 622, 109 S.Ct. 3086, Appendix B.) The City’s portion of this building houses its “principal offices, including the mayor’s,” 492 U.S. at 581, 109 S.Ct. 3086, and is thus the functional equivalent of a city hall. This second display included three elements: a decorated 45-foot Christmas tree; an 18-foot menorah that was owned by Chabad, a Jewish group, but was stored, erected, and removed each year by the City; and a sign stating: “During this holiday season, the city of Pittsburgh salutes liberty. Let these festive lights remind us that we are keepers of the flame of liberty and our legacy of freedom.” Id. at 582, 587, 109 S.Ct. 3086.
Six Justices concluded that this display was constitutional, but they set out their views in three separate opinions. First, four Justices approved Justice Kennedy’s opinion, which concluded that both Pittsburgh displays satisfied the Establishment Clause. Justice Kennedy concluded that these displays did not violate the Establishment Clause because they were noncoercive and did not give direct benefit to religion in such a degree that they established or tended to establish religion. 492 U.S. at 659, 663-67, 109 S.Ct. 3086 (opinion of Kennedy, J.). He noted that it is indisputable that government may participate in celebrating holidays with religious origins, and he added that requiring government to refrain from any use of religious symbols in connection with these celebrations would convey a message of hostility to religion. He wrote:
If government is to participate in its citizens’ celebration of a holiday that contains both a secular and religious component, enforced recognition of only the secular aspect would signify the callous indifference toward religious faith that our cases and traditions do not require....
Id. at 664,109 S.Ct. 3086.
Second, Justice Blackmun addressed the City-County Building display in Part VI of his opinion, which was not endorsed by any other member of the Court. 492 U.S. at 613-21, 109 S.Ct. 3086 (opinion of Blackmun, J.). Justice Blackmun concluded that this display represented a celebration by the city of “both Christmas and Chanukah as secular holidays.” Id. at 615, 109 S.Ct. 3086. He interpreted the display to mean that “both Christmas and Chanukah are part of the. same winter-holiday season, which has attained a secular status in our society.” Id. at 616, 109 S.Ct. 3086. He noted that the tallest object in the display, the tree, is a secular *103 symbol, and while he recognized that the menorah is a religious symbol, he suggested that it did not in context convey a religious message because of the proximity of the larger tree and the fact that, in his view, there was no comparable secular symbol of Chanukah that the City could have used. Id. at 616-18, 109 S.Ct. 3086. He was fortified in this view by the mayor’s sign, which saluted liberty and drew “upon the theme of light ... common to both Chanukah and Christmas as winter festivals.Id. at 619, 109 S.Ct. 3086.
Third, Justice O’Connor concluded in a separate concurrence that the “combined holiday display of a Chanukah menorah, a Christmas tree, and a sign saluting liberty d[id] not have the effect of conveying an endorsement of religion.” Id. at 632, 109 S.Ct. 3086. She agreed with Justice Blaek-mun that the Christmas tree is a secular symbol, but she felt that Justice Blackmun’s analysis “obseure[d] the religious nature of the menorah and the holiday of Chanukah.” Id. at 633, 109 S.Ct. 3086. She viewed “the relevant question for Establishment Clause purposes” as “whether the city of Pittsburgh’s display of the menorah, the religious symbol of a religious holiday, next to a Christmas tree and a sign saluting liberty sen[t] a message of government endorsement of Judaism or whether it sen[t] a message of pluralism and freedom to choose one’s own beliefs.” Id. at 634, 109 S.Ct. 3086. She opined that the latter, secular message was the one that the display conveyed:
By accompanying its display of a Christmas tree-a secular symbol of the Christmas holiday season-with a salute to liberty, and by adding a religious symbol from a Jewish holiday celebrated at roughly the same time of year, ... the city did not endorse Judaism or religion in general, but rather conveyed a message of pluralism and freedom of belief during the holiday season.
Id. at 636, 109 S.Ct. 3086 (O’Connor, J., concurring).
Justice O’Connor rejected the suggestion that the display conveyed “a message that endorses religion over nonreligion,” observing that “[a] reasonable observer would ... appreciate that the combined display [was] an effort to acknowledge the cultural diversity of our country and to convey tolerance of different choices in matters of religious belief or nonbelief by recognizing that the winter holiday season is celebrated in diverse ways by our citizens.”[8] Id. at 636-36, 109 S.Ct. 3086.[9]
Because of the splintered majority in Allegheny County with respect to the constitutionality of the display in front of the City-County Building, we must employ the standard set out in Marks v. United States, 430 U.S. 188, 97 S.Ct. 990, 61 L.Ed.2d 260 (1977), in order to identify the Court’s holding. Specifically, we must examine the positions taken by the Justices needed to form a majority and follow the opinion that supports the majority position on the narrowest grounds. See Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 58 (3d Cir.1992); Planned Parenthood of Southeastern Pennsylvania v. Casey, 947 F.2d 682, 693-94 (3d Cir.1991), aff'd in part and rev’d in part, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).
In the ease of Allegheny County, Justice O’Connor’s opinion sets out the position that we must follow. In order to be sustained, a display would have to satisfy, at a minimum, the standards set out in Justice Kennedy’s opinion, which was approved by three other Justices, as well as the standards set out in Justice O’Connor’s opinion. Although Justice Blaekmun also voted to sustain the display at the City-County Building, his position seemingly imposes more formidable standards, and a display would not have to meet those standards in order to survive. Accordingly, in considering how the modified Jersey City display now before us fares under Allegheny County, we will focus on Jus *104 tice O’Connor’s opinion. Before doing that, however, we will first test the modified Jersey City display against the teachings of Lynch.
V.
The display that the Supreme Court sustained in Lynch resembles the modified Jersey City display in several important respects. Both included one or more religious symbols owned by the city (in Lynch, a creche; in Jersey City, a creche and a menorah), as well as a variety of secular ones. Both included one or more secular signs or banners (in Lynch, a banner proclaiming “SEASONS GREETINGS”; in Jersey City, two signs that read: “Through this display and others throughout the year, the City of Jersey City is pleased to celebrate the diverse cultural and ethnic heritages of its peoples.”). Accordingly, Lynch appears to support the constitutionality of the modified Jersey City display unless some constitutionally significant distinction can be shown.
One potentially important difference is that the display in Pawtucket was located on private property in the center of the city’s business district, whereas the Jersey City display was situated in front of City Hall on public land. In Lynch, neither the opinion of the Court nor Justice O’Connor’s concurrence seemed to attribute constitutional significance to this fact. (The opinion of the Court noted the fact in passing at the beginning of the opinion, 466 U.S. at 671, 104 S.Ct. 1355, and Justice O’Connor did not mention this fact at all.) However, Justice O’Con-nor’s opinion in Allegheny seemed to place greater emphasis on this aspect of the Pawtucket display, 492 U.S. at 623, 626, 109 S.Ct. 3086 (O’Connor, J., concurring), and therefore we will discuss this potentially significant distinction in connection with our discussion of Allegheny County.
With the possible exception of this factor, however, we see no reasonable basis for distinguishing the modified Jersey City display from the display upheld in Lynch. The plaintiffs and our dissenting colleague suggest that the cases can be distinguished on the ground that in the modified Jersey City display “Santa Claus and Frosty the Snowman clearly do not constitute separate focal points or centers of attention coequal with the Menorah and the Nativity Scene,” Appel-lees’ Br. at 14, buNwe see no basis for this distinction. Appendices A and B to this opinion, which depict the modified displays on both sides of City Hall in Jersey City, speak for themselves. In the modified display on the right, the sleigh is just as much a focal point as the figures in the nativity scene. And in the modified display on the left, the tree is just as much a focal point as the menorah.[10]
The dissent attempts to distinguish the modified Jersey City display from the display in Lynch on the ground that “the Jersey City display had more and larger sectarian symbols combined with fewer secular symbols.” Dissent at 111. What the record shows, however, is the following. With respect to the size of the religious symbols in the two displays, the nativity-scene figures in the Jersey City display, which ranged from 12 inches to 27 inches in height, were not larger than those in the Lynch display, which ranged in height from five inches to five feet. 465 U.S. at 671, 104 S.Ct. 1355. Nor were there more figures in the Jersey City nativity scene than in the Pawtucket scene, which contained figures of “the Infant Jesus, Mary and Joseph, angels, shepherds, kings, and animals.” 465 U.S. at 671, 104 S.Ct. 1355. Thus, the dissent’s point boils down to this: the Jersey City display differed from the Lynch display in that it included a large menorah and a smaller number of secular symbols. But any suggestion that these factors are dispositive for Establishment Clause purposes is belied by the Supreme Court’s holding in Allegheny County that the display of a large menorah and one secular symbol, a *105 Christmas tree, in front of the City-County Building in Pittsburgh was constitutional.
It is interesting that the plaintiffs deride some of the very distinctions that the dissent finds so significant. See Appellees’ Br. at 15 (the court should not “engage in the fruitless exercise of determining, figuratively, ‘how many candy canes offset one Jesus?’ .... There is simply no common currency or rate-of exchange by which religious and secular symbols can be traded and offset.”). Instead, the plaintiffs stress the District Court’s observation on remand that Jersey City’s addition of the secular symbols was “a ploy designed to permit continued display of the religious symbols.” The suggestion seems to be that, even if Jersey City could have properly erected the modified display in the first place, the City’s initial display, which was held to violate the Establishment Clause, showed that the city officials were motivated by a desire to evade constitutional requirements and that this motivation required invalidation of the modified display. Asked during oral argument whether this meant that Jersey City might be precluded • from erecting a display identical to one that would be permissible in other nearby cities, counsel for the plaintiffs insisted that Jersey City’s “prior history” would have to be taken into account, at least until the time came when it could be considered to be “purged” of the “prior constitutional taint.” Oral Arg. Tr. at 27.
We reject this argument. The mere fact that Jersey City’s first display was held to violate the Establishment Clause is plainly insufficient to show that the second display lacked “a secular legislative purpose,” see Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105, or that it was “intend[ed] to convey a message of endorsement or disapproval of religion.” Lynch, 465 (O’Connor, J., concurring). As our prior discussion of Lynch and Allegheny County illustrates, the Supreme Court’s decisions regarding holiday displays have been marked by fine line-drawing, and therefore it is not easy to determine whether particular displays satisfy the Court’s standards. Under these circumstances, the mere fact that city officials miscalculate and approve a display that is found by. the federal courts to cross over the line is hardly proof of the officials’ bad faith.[11] Although the original Jersey City display was ultimately struck down, no Supreme Court or Third Circuit precedent clearly established that it was unconstitutional until the prior panel handed down its decision, and therefore the city officials’ decision to continue to erect that display, which had been put up for decades, .can hardly be viewed as evidence of an intent to flout the Establishment Clause.[12]
We now consider how the modified Jersey City display fares under the holding of the Supreme Court in Allegheny County. The Court’s decision striking down the display of the creche on the Grand Staircase of the Allegheny County Courthouse does not cast doubt on the constitutionality of the modified Jersey City display. As noted earlier, the display on the Grand Staircase consisted of a creche with a religious proclamation (“Gloria in Excelsis Deo”) surrounded by a floral decoration that “serve[d] only to draw one’s attention” to the creche. 492 U.S. at 598-99, 109 S.Ct. 3086. The display contained no secular symbols, and the display did not communicate to a reasonable observer the sort of secular message that is needed to pass Establishment Clause scrutiny, e.g., acknowledgment of “the cultural diversity of our country” and support for “tolerance of different choices in matters of religious belief or nonbelief by recognizing that the winter holiday season is celebrated in diverse ways by our citizens.” Allegheny County, 492 U.S. at 636, 109 S.Ct. 3086 (O’Connor, J., concur *106 ring). The modified Jersey City display expressly conveyed this very message by means of its sign and implicitly conveyed the same message through its diverse nonverbal elements. Thus, the unconstitutional display on the Grand Staircase of the Allegheny County Courthouse is readily distinguishable from the modified Jersey City display.
On the other hand, there are instructive parallels between the constitutionally permissible display in front of the City-County Building and the modified Jersey City display. (Indeed, the photograph of the City-County Building display, see 492 U.S. at 622, 109 S.Ct. 3086, and the display on the left-side of Jersey City’s City Hall (see Appendix A of this opinion) are virtually identical except for the presence of Santa in the latter display). First, both displays contained both secular and religious symbolism. It is true that the City-County Building display included fewer religious symbols (a menorah only) than the modified Jersey City display (both a menorah on the left side of City Hall and a creche on the right), but the City-County Building display also included fewer secular symbols, and in both cases the balance seems to have been roughly the same. Moreover, Justice O’Connor’s opinion in Allegheny County refutes any suggestion that the display of a menorah is inherently less likely to create Establishment Clause problems than is the display of a creche. Eschewing the suggestion that Chanukah is “a ‘secular’ holiday” or that “the menorah has a ‘secular dimension,’ ” she pointedly wrote that “the menorah is the central religious symbol and ritual object of [a] religious holiday.” 492 U.S. at 633-34,109 S.Ct. 3086. She similarly rejected the idea that, because “it would be implausible for the city to endorse a faith adhered to by a minority of the citizenry,” inclusion of a menorah in a holiday display is less likely than a Christian religious symbol to convey a message of government endorsement of religion. Id. at 634, 109 S.Ct. 3086. She wrote that “[a] menorah standing alone at city hall may well send such a message to nonadherents, just as in this case the creche standing alone at the Allegheny County Courthouse sends a message of governmental endorsement of Christianity....” Id.
Second, the strong similarity between the location of the City-County Building display (on public land in front of what is in essence Pittsburgh’s City Hall) and the location of the Jersey City display (on public land in front of City Hall) is particularly important in light of our earlier conclusion that the only basis on which the Pawtucket display upheld in Lynch might potentially be distinguished from the modified Jersey City display was that the former display was located on private land in the city’s business district. The portion of Justice O’Connor’s separate opinion in Allegheny County relating to the display on the Grand Staircase suggested that this distinction had some significance.[13] But when Justice O’Connor turned to the display in front of the City-County Building-a location indistinguishable for present purposes from the site of the Jersey City display-she held that the display was constitutional. (The other factors that Justice O’Connor stressed in this portion of her Allegheny County opinion-the tree and the sign-also have close parallels here). This persuades us that the location of the Jersey City display on public property in front of City Hall does not in itself provide a valid basis for holding the display to be unconstitutional.
Moreover, although this factor is not necessary to our decision, we are convinced that, in evaluating the message conveyed by the modified Jersey City display to a reasonable observer, the general scope of Jersey City’s practice regarding diverse cultural displays and celebrations should be considered. In our en banc decision in ACLU of N.J. v. Black Horse Pike Regional Bd. of Ed., 84 F.3d 1471 (3d Cir.1996), we held that, in determining whether a government practice endorses religion, “ ‘the “history and ubiqui *107 ty” of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion.’ ” Id. at 1486 (quoting Allegheny County, 492 U.S. at 630, 109 S.Ct. 3086 (O’Connor, J., concurring)); see also Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 779, 115 S.Ct. 2440, 2455, 132 L.Ed.2d 650 (1995) (O’Connor, J., concurring) (“the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears”; “the knowledge attributed to the reasonable observer [cannot] be limited to the information gleaned simply from viewing the challenged display”). To the extent that the prior panel opinion, see 104 F.3d at 1448-49, conflicted with our prior en banc decision in Black Horse Pike, the prior en banc decision must of course take precedence.
In sum, we are unable to perceive any meaningful constitutional distinction between the display at issue here and those that the Supreme Court upheld in Lynch and Allegheny County. Reasonably viewed, none of these displays conveyed a message of government endorsement of Christianity, Judaism, or of religion in general but instead “sent a message of pluralism and freedom to choose one’s own beliefs.” Allegheny County, 492 U.S. at 633, 109 S.Ct. 3086 (O’Connor, J., concurring). If we follow Lynch and Allegheny County, we have no alternative but to reverse the permanent injunction insofar as it enjoins Jersey City from erecting the modified display “or any substantially similar scene or display in the vicinity of the entrance to the City of Jersey City’s City Hall.” Indeed, even if we were persuaded that the modified display itself was unconstitutional, we could not possibly approve an injunction against “any substantially similar scene or display.” Both the Pawtucket display and the display in front of the City-County Building in Pittsburgh were, at the least, “substantially similar” to the modified Jersey City display, and consequently the District Court’s injunction has the obviously improper effect of enjoining displays that are identical to ones that have passed the Supreme Court’s scrutiny.
The dissent’s attempt to distinguish the modified Jersey City display from the display upheld in Allegheny Court is unpersuasive. The dissent first observes that in Allegheny County the 45’ tall Christmas tree “dwarfed the 18’ tall menorah.” Dissent at 111. The reader can compare the photograph of the display sustained in Allegheny County (see 492 U.S. at 622, 109 S.Ct. 3086) with Appendix A to -this opinion (the left side of the Jersey City display) and make an independent judgment as to whether the two scenes are constitutionally distinguishable. In our view, they are not. The two menorahs are comparable in height (18’ tall in Allegheny, 19’ tall in Jersey City), and. although the tree in Pittsburgh appears larger than that in Jersey City, it is difficult to believe that this difference in height is dispositive.
The dissent next observes that “a display’s location informs the constitutional analysis” (Dissent at 111), but the dissent obscures the fact that the display upheld in Allegheny County and the Jersey City display were located in comparable spots: on public land in front of the building that housed the principal offices of the municipal government.
The dissent notes that “Jersey City used public funds to own, erect, and maintain the creche and the menorah.” Dissent at 111. But in Allegheny County, the menorah was also “stored, erected, and removed each year by the city.” 492 U.S. at 587, 109 S.Ct. 3086 (opinion of Blackmun, J.). And in Lynch, the city owned, erected, and dismantled the creche. 468 U.S. at 671, 104 S.Ct. 3262.
Finally, the dissent argues that, whereas “a display containing only a menorah and a Christmas tree” may be constitutional, “when a creche and a menorah are displayed together, ‘the menorah’s religious significance is emphasized.’ ” Dissent at 111-12 (quoting Schundler I, 104 F.3d at 1446). This statement overlooks the fact that the creche and menorah were displayed on opposite sides of the City Hall Plaza Park. See Appendix C. More important, since Lynch teaches that display of a creche is not per se unconstitutional, and Allegheny County teaches that the same is true of a menorah, it is hard to *108 accept the proposition that the Establishment Clause is violated when these two symbols are displayed together as part of a holiday display that includes secular symbols and is dedicated to the celebration of a municipality’s cultural diversity.
VI.
Before concluding, we find it necessary to explain why we do not agree with some of the prior panel’s dicta regarding the modified display. Our central point of disagreement concerns the prior panel’s suggestion that any inclusion of a creche-but not a menorah-in a display in front of a prominent government building, such as a city hall, is incompatible with the Establishment Clause. The prior panel observed:
Government display of a creche [unlike a menorah] cannot convey a meaning separate from the very act it is meant to portray. A creche depicts the Birth of Christ, the event that lies at the foundation of Christianity. In Allegheny County, the Court determined that displays containing a creche as a primary focal point, which are situated at the seat of government, are constitutionally impermissible as they convey a message of government endorsement. This is consistent with Lynch, in which the Court permitted a creche that was part of a display in a private park depicting a “winter wonderland” scene because, in context, there were no external indicia of government endorsement.
104 F.3d at 1451.
We respectfully submit, in part for reasons that we have already discussed, that this dicta misinterprets both Lynch and Allegheny County. First, the distinction that is drawn between a creche and a menorah necessarily rests on the mistaken view that these two symbols differ critically with respect to the nature or degree of the religious message that they convey. As we have explained, however, Justice O’Connor flatly rejected this suggestion in her pivotal Allegheny County opinion. See 492 U.S. at 633-34, 109 S.Ct. 3086 (opinion of O’Connor, J.). Once it is recognized that a creche and a menorah should be regarded as equivalent religious symbols for the purpose of analyzing holiday displays, the similarity between the constitutionally permissible display in front of the City-County Building in Pittsburgh and the modified display in front of Jersey City’s City Hall becomes apparent.
Second, we cannot agree with the prior panel’s suggestion that in Lynch “the Court permitted a creche that was part of a display in a private park depicting a ‘winter wonderland’ scene 'because, in context, there were no external indicia of government endorsement.” 104 F.3d at 1451 (emphasis added). As we have noted, in Allegheny County, Justice O’Connor, as well as Justice Blackmun, seems to have attributed some significance to the fact that the display in Lynch was situated on private property in the center of Paw-tucket’s commercial district, but to go further, as the prior panel did, and say that the Pawtucket display bore “no external indicia of government endorsement” is not correct. In Lynch, every Justice, whether in the majority or the dissent, agreed that by means of its holiday display the city of Pawtucket was endorsing some message. The Justices differed in their interpretation of the message that the display conveyed, but they all understood that the message was linked to the City-as the lower court opinions in that case made abundantly clear:
[I]t is difficult to suggest that anyone could have failed to receive a message of government sponsorship after observing Santa Claus ride the city fire engine to the park to join with the mayor of Pawtucket in inaugurating the holiday season by turning on the lights of the city-owned display. See Donnelly v. Lynch, 525 F.Supp. 1150, 1156 (D.R.I.1981). Indeed, the District Court in Lynch found that ‘people might reasonably mistake the Park for public property,’ and rejected as ‘frivolous’ the suggestion that the display was not directly associated with the city. Id, at 1176, and n. 35.
Allegheny County, 492 U.S. at 666-67, 109 S.Ct. 3086 (opinion of Kennedy, J.). Once these two points are recognized-that the menorah and the créche must be viewed for present purposes as equivalent religious symbols and that the display in Lynch indisputably involved the conveyance of a govern *109 ment message — the foundation of the prior panel’s dicta is undermined.
VII.
For these reasons, we affirm the decision of the District Court insofar as it denied the defendants’ motion under Rule 60(b)(5) for relief from the Court’s previous judgment. However, we reverse the District Court’s order insofar as it disposed of the parties’ cross-motions for summary judgment with respect to the modified display and insofar as it enjoined the defendants from erecting that or any substantially similar display. We remand the case to the District Court with instructions to grant summary judgment in favor of the defendants.

. See 104F.3dat 1438 n. 1.

. According to the City, such an anomaly will not recur until 2014.

.Neither side has argued in this appeal that the state constitution imposes tighter restrictions than the federal Constitution. Therefore, for purposes of this litigation we treat the two bodies of law as coextensive. See ACLU of N.J. v. Schundler, 104 F.3d at 1446 n. 11.

. The panel asked: "Should a rabbi and a priest be consulted when erecting the menorah and the creche? Should a ceremony accompany the erection of these religious symbols? Should the City employ a Muslim cleric during the Ramadan Observance month to avoid offending a theological protocol of Islam?” 104 F.3d at 1449 (footnote omitted). Compare ACLU, Greater Pittsburgh Chapter v. Allegheny County, 842 F.2d 655, 662 (3d Cir.1988) ("mere placement and storage [of religious display] will involve little entanglement”), affd in part and rev'd in part, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

. Title I of the Elementary and Secondary Education Act of 1965, 79 Stat. 27 (1965), as modified, 20 U.S.C. § 6301 etseq. (1994).

. Our court strives to maintain a consistent body of circuit jurisprudence. Thus, ''[i]t is the tradition of this court that the holding of a panel in a reported opinion is binding on subsequent panels” and that “no subsequent panel overrules the holding in a published opinion of a previous panel.” Internal Operating Procedure 9.1 (emphasis added). Dicta in prior opinions, however, are not treated similarly. On the contrary, we have repeatedly held that dicta are not binding. See, e.g., McGurl v. Trucking Employees, 124 F.3d 471, 484 (3d Cir.1997); United States v. Bennett, 100 F.3d 1105, 1110 (3d Cir.1996); Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1071 (3d Cir.1990). Our tradition of treating prior panel decisions as binding is closely tied to the rules and procedures regarding rehearing en banc. Rehearing en banc provides the opportunity for the full court to correct a panel decision to which the court is unwilling to be bound. But the standards for rehearing en banc look to the panel’s decision, not to the panel’s dicta. See Fed. R.App.P. 35 (emphasis added) (rehearing in banc may be ordered by a court of appeals "to secure or maintain uniformity of its decisions .... ”). LAR 35.1 (emphasis added) (if rehearing is sought based on an asserted conflict with prior circuit precedent, counsel must certify, "based on a reasoned and studied professional judgment, the panel decision is contrary to decisions of the United States Court of Appeals for the Third Circuit ... and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court.”). Thus, panel dicta are generally not tested by the availability of en banc review, and they are accordingly not entitled to the same binding authority that our court has traditionally given to panel decisions.

. See ACLU of N.J. v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1486 (3d Cir.1996) (general summary of Lynch).

. See Black Horse Pike, 84 F.3d at 1486-87 (general summary of Allegheny County).

. The three dissenters-Brennan, Marshall and Stevens-held the same view of the scene in front of City Hall as they did of the creche on the great staircase. 492 U.S. at 637-46, 109 S.Ct. 3086 (Brennan, J., concurring in part and dissenting in part); id. at 646-55, 109 S.Ct. 3086 (Stevens, J., concurring in part and dissenting in part).

. The plaintiffs’ reference to "separate focal points” was derived from Justice Blackmun’s discussion of the display of the creche on the Grand Staircase of the county courthouse in Allegheny County. Writing for the Court in this portion of his opinion, Justice Blackmun contrasted this display, in which the creche "st[ood] alone” as "the single element of the display on the Grand Staircase,” with the Pawtucket display, in which each of the secular figures "had its own focal point.” 492 U.S. at 598, 109 S.Ct. 3086.

. If reaching the erroneous conclusion that a particular display is constitutional is regarded as proof of an intent to flout the Establishment Clause, are Allegheny County dissenters implicated by virtue of their views?

. The plaintiffs’ position is also contrary to the Supreme Court’s treatment of the two displays at issue in Allegheny County. If the plaintiffs’ view were correct, the erection of the unconstitutional display on the Grand Staircase of the County Courthouse should have militated in favor of also striking down the display in front of the City-County Building, but a majority of the Supreme Court sustained that display, and not one Justice took the position that the officials’ miscalculation regarding the Grand Staircase tainted the decision concerning the City-County Building.

. Justice O'Connor noted that the creche in Lynch had been "displayed in a private park in the city’s commercial district,” and she opined that "[t]he display of religious symbols in public areas of core government buildings runs a special risk of 'mak[ing] religion relevant, in reality or public perception, to status in the political community.’ ” 492 U.S. at 626, 109 S.Ct. 3086 (O’Connor, J., concurring (quoting Lynch, 465 U.S. at 692, 104 S.Ct. 1355 (O’Connor, J., concurring))).